WM. LINDEKE LAND COMPANY v. C. O. KALMAN AND ANOTHER.[1]

February 2, 1934.

Nos. 29,467, 29,468.

[1]Reported in 252 N. W. 650.

*Oppenheimer, Dickson, Hodgson, Brown & Donnelly,* for appellant C. O. Kalman.

*Morphy, Bradford, Cummins & Cummins,* for appellant George M. Stoughton.

*Sanborn, Graves & Andre* and *J. Neil Morton,* for respondent.

*DEVANEY, Chief Justice.*

This is an action brought to enforce personal liability upon the individual trustees of a trust for rent due under a lease signed by them as trustees. In July, 1920, W. H. Gilbert transferred to M. R. Knauft, C. O. Kalman, and John A. Reagan as trustees property consisting of certain restaurants in St. Paul and Minneapolis known as the "Eat Shops" to be held and operated by said trustees and their successors in office for the benefit of the holders of certificates of beneficial interest in said trust. The trust instrument contained provisions whereby the trustees might resign. "Trustees" were defined to mean "those who are or may be trustees for the time being." The instrument stated that each trustee was to be liable only for his own wilful breach of trust. The trustees as such had no interest in the trust income or property, such income and property belonging exclusively to the holders of the certificates of beneficial interest in the trust. Shortly thereafter John A. Reagan resigned as a trustee, and George Stoughton was elected in his place.

On November 20, 1922, Knauft, Kalman, and Stoughton "as trustees of the Eat Shops," under that certain declaration of trust made July 19, 1920, between Woodland H. Gilbert, M. R. Knauft, C. O. Kalman, and John A. Reagan, establishing what is known as the "Eat Shop Trust," leased of the plaintiff certain real estate in the city of St. Paul for a term of eight years from and after September 1, 1925. This lease ran to the trustees, "their successors and assigns," and the covenants of the lessees bound "their successors and assigns." This lease was signed by the three trustees "as trustees of the Eat Shop" and was acknowledged by them "as trustees." In addition to the above there was attached to the lease and executed simultaneously therewith a written guaranty signed by Stoughton and Knauft but not by Kalman, under the terms of which Stoughton and Knauft "jointly and severally guarantee the full performance by the lessees above named of all the terms, cove-

nants and conditions of the foregoing lease required to be performed by the lessees during the first three years of the term reserved in said lease."

On May 18, 1925 (accepted May 19, 1925) Kalman resigned as trustee, and one G. L. Goob was elected in his stead. Thereafter Kalman had no connection with the affairs of the trust except such of his liability as remained as a matter of law after his resignation. At least as early as the fall of 1926 the fact of Kalman's resignation and his ceasing to be a trustee was known to plaintiff. In March, 1930, without consulting Kalman and without knowledge on his part, plaintiff, through its agent, the Northwestern Trust Company, agreed to modify the lease by agreeing to bear a part of the cost of certain repairs. Later and in March, 1931, the Eat Shops, by Stoughton, president, addressed a letter to the agent of plaintiff setting forth in detail its financial condition and asking for a reduction in rent. At this time Stoughton conferred with the representatives of the plaintiff, Mr. Stolpestad, head of the real estate department of the trust company, and Mr. Ray, president of the trust company and a director in the plaintiff corporation, discussed with them in detail existing business conditions and the effect thereof upon the business of the Eat Shop Trust, and brought to the plaintiff's attention the fact that the Eat Shops were at that time being operated at a loss. In the light of this fact and the statements of Stoughton that the Eat Shops would vacate the property of plaintiff if no relief were granted, the plaintiff, without the knowledge of and without consulting the defendant Kalman and without his consent, modified the lease reducing the amount of rent for a period of one year from April 1, 1931, by the sum of $1,000 per year. This reduction was acted upon and the reduced rent paid thereunder for the months of April, May, June, and July, 1931, at which time the rent became in default and was charged or billed at the reduced price for the subsequent months. Since April 1, 1931, the date of the modification of the lease and up to the time of the commencement of this action, the Eat Shop Trust lost in excess of $30,000.

Kalman first learned of the default in the Eat Shop Trust when a letter dated December 14, 1931, was mailed to him. No demand

for the payment of rent was ever made on him until that date, nor was any demand ever made of Kalman individually as distinguished from the Eat Shop Trust until a like date. At this time Kalman first learned of the modification of the lease. The trial court granted plaintiff's motion for a directed verdict against defendants on the basis of rentals at the reduced rate under the agreement of March 1, 1931, plus taxes paid by plaintiff payable under the terms of the lease by the lessees. Defendants appealed from the order denying their alternative motion for judgment or a new trial.

We consider first the case as to appellant Kalman. He notes various assignments of error which state his contention as follows:

(1)  Kalman was not originally personally liable on the contract with the plaintiff because such personal liability was negatived as a matter of law by the contract.

(2)  If it did not clearly appear from the writing that he was personally liable thereon, the court should have allowed the introduction of evidence of the surrounding circumstances under which the contract was entered into to clear up uncertainty and ambiguity.

(3)  Assuming an original personal liability, by his resignation he became only a surety for the other trustees.

(4)  Being a surety when plaintiff with knowledge of Kalman's resignation changed the terms of the lease, it released Kalman from liability.

(5)  Changing the terms of the lease without Kalman's consent amounted to a surrender of the lease as to him.

An analysis of appellant Kalman's position indicates that it rests on three propositions to defeat plaintiff's claim:  (a) That Kalman is not personally liable on the contract made on behalf of the trust because his personal liability was expressly or impliedly negatived; (b) that if the contract be viewed in the light of the surrounding circumstances it was ambiguous leaving the question whether it impliedly negatived the personal liability one of fact upon which a jury must pass; (c) that defendant Kalman was relieved from his alleged personal obligation under the contract by the change without his consent in the terms of the lease.

In considering appellant Kalman's first defense we must construe and interpret a contract. We must therefore call to our aid certain rules of construction. 13 C. J. p. 520, § 481, says:

"The law furnishes certain rules for the construction of written contracts for the purpose of ascertaining from the language the manner and extent to which the parties intended to be bound * * *."

Rules of construction, however, are not inflexible, their purpose being to reach the probable intent of the parties, and therefore principles of technical nicety cannot always be strictly employed in the construction of everyday contracts made by business men in the course of their dealings. The rules of interpretation are intended for persons of common understanding.

(a)   The intention of the parties should govern. In 6 R. C. L. p. 835, § 225, it is stated:

"Generally speaking, the cardinal rule in the interpretation of contracts is to ascertain the intention of the parties and to give effect to that intention if it can be done consistently with legal principles."

If the intention contracted to be carried out conflicts with the statute law or the well clarified and clearly expounded rules set forth by judicial decision, such intention will not be carried out because against law. Again, if the expressed intention conflicts with the recognized rights of others so as to threaten the health, disturb the peace, or endanger the safety or morals of other citizens, the intention will not be carried out because against public policy. That reasoning has no application here because the controversy over the contract is strictly a private controversy. No consideration of law or public policy would stand in the way of Kalman's covenants to protect himself against personal liability in any contract which he might have entered into for the benefit of this trust.

(b)   On the execution of a contract in writing, delivery is ordinarily an essential element. Delivery puts into the writing evidencing the contract the "breath of life," and the contract must be construed as of the date of delivery and as the parties understood it under the then surrounding circumstances.

(c) Separate writings as part of the same transaction must be construed together. 13 C. J. p. 528, § 487, says:

"Where several instruments are made as part of one transaction, they will be read together, and each will be construed with reference to the other. This is true, although the instruments do not in terms refer to each other. So if two or more agreements are executed at different times as parts of the same transaction they will be taken and construed together."

See also Brackett v. Edgerton, 14 Minn. 134 (174), 100 Am. D. 211; Lindley v. Groff, 37 Minn. 338, 34 N. W. 26; Myrick v. Purcell, 95 Minn. 133, 103 N. W. 902, 5 Ann. Cas. 148; White v. Hewitt, 119 Minn. 340, 138 N. W. 421. See Restatement, Contracts, § 235(c). In this case it is evident that exhibit B, which consists of the lease proper and the guaranty, is one contract and not two and that it became such a contract by the last signature thereto and the delivery of the completed instrument thereafter.

(d) Words in a written contract are to be construed according to their ordinary and popularly accepted meaning. Restatement, Contracts, § 235(a).

(e) The expression in a contract of one or more things of a class implies the exclusion of all not expressed. The guaranty portion of exhibit B purports to state which of the three parties (trustees) are personally bound to carry out the terms of the lease. Under the rule of *expressio unius,* by enumerating those who were to be personally liable and specifying the period during which their personal liability would extend, other persons of the same class (Kalman) would be excluded. See Thos. Beck & Sons v. Economy Coal Co. 149 Iowa, 24, 127 N. W. 1109.

(f) The existing statutes and the settled law of the land at the time a contract is made become a part of it and must be read into it except where the contract discloses an intention to depart therefrom. Haugen v. Sundseth, 106 Minn. 129, 118 N. W. 666, 16 Ann. Cas. 259. In this case we need not prefer the intention of the parties as expressed in the contract over any statutory declarations, but only lay aside as inapplicable to the controversy a principle of

law resting upon judicial decision of which the parties may have had no knowledge. It seems more than probable that they had no knowledge of such judicial principle, but if they had such knowledge it seems clear that they indicated an intention to depart therefrom.

(g) The language of a contract should be construed so as to subserve and not subvert the general intention of the parties. Restatement, Contracts, § 236(b).

We have gone to much greater length in discussing these rules of construction than the instant case requires. We are constrained to do so because of the question as to whether the contract before modification by rent reduction was ambiguous or otherwise. Particularly are we so constrained because of the learned trial court's statement:

"I feel that were the question left to a jury or perhaps to any laymen, they would come to the conclusion from the language and from their own experience that it was the intention to hold these parties only as trustees."

Under that view of the facts in the instant case and consistent with the rules of construction here discussed, the trial court should have given effect to that intention. In doing so, in our opinion he would not have been in error. In the interpretation of contracts, courts will come closer to the truth and more nearly approximate justice between litigants if they have in mind the statement of Mr. Justice Holmes in The Kronprinzessin Cecilie, 244 U. S. 12, 24, 37 S. Ct. 490, 492, 61 L. ed. 941:

"Business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs."

It was the duty of the court to ascertain what these plain business men had agreed upon among themselves and to give effect to that meaning, unless it was found contrary to expressed law or to a paramount public interest known as public policy. We cannot agree with the trial court's statement that all juries and laymen would reach identical conclusions from the language of the contract and from their own experience. If the writing appeared to be ambiguous or an ordinary business man would consider it to be am-

biguous, the trial court should have admitted the testimony tendered by defendant Kalman, not to vary the terms of the contract but to throw the light afforded by the surrounding circumstances on the writing to clarify it and to dissipate the ambiguity.

Respondent avers that the instrument before the court in the case at bar contains no contract against liability, express or implied. It cites seven cases in support of its claim that we should declare that, since the three trustees here are described "as trustees" and signed "as trustees," they must be held to be personally bound because they had not negatived their personal liability in such positive terms as by the phrase "as trustees but not otherwise" or "we as trustees, but not individually." Ogden Ry. Co. v. Wright, 31 Or. 150, 49 P. 975; Jordan v. Trice, 6 Yerg. (Tenn.) 479; Muir v. City of Glascow Bank, 4 App. Cas. 337; Rosenthal v. Schwartz, 214 Mass. 371, 101 N. E. 1070; Carr v. Leahy, 217 Mass. 438, 105 N. E. 445; Duvall v. Craig, 2 Wheat. (U. S.) 45, 4 L. ed. 180; Taylor v. Davis, 110 U. S. 330, 4 S. Ct. 147, 28 L. ed. 163. These cases are not directly in point or applicable to the question here concerning a Massachusetts or business trust. These trusts, now widely used in the conduct of general business and possessing many of the characteristics and advantages of corporations, were first formed in Massachusetts, and practically all law concerning them has been made or clarified within the last 50 or 75 years. None of respondent's cases refer to a business trust except that of Carr v. Leahy, 217 Mass. 438, 105 N. E. 445. Even in that case the business trust only incidentally appears. It has no substantial analogy to the instant case. The other six cases have no application to trustees of a business or Massachusetts trust but concern administrators, trustees for persons, etc. Instead of such cases as Jordan v. Trice, 6 Yerg. (Tenn.) 479, decided 100 years ago, or Duvall v. Craig, 2 Wheat. (U. S.) 45, 4 L. ed. 180, decided 117 years ago, and before the law of business trusts developed, we prefer to turn for light to Larson v. Sylvester, 282 Mass. 352, 185 N. E. 44, 45. In that case the defendant, having been held personally liable, on appeal made objection to the charge of the trial court to the jury. Approving the instruction, the opinion quotes it as follows [282 Mass. 356]:

" 'If a person, who undertakes to act as a trustee in behalf of a trust estate, enters into a contract with a third party, if he doesn't clearly stipulate he is not to be held personally responsible for it, the third party who does business with him can hold him personally responsible, notwithstanding the fact that the trust estate received the benefit and the enjoyment of his work. * * * If you find that this defendant did not stipulate that he was not to be held personally responsible, that is, if he didn't say something or do something that would exonerate him from personal liability, the plaintiff can recover from him notwithstanding the fact that he says that he was acting in the capacity of trustee, because, as I said a moment ago, a man acting as trustee can be held personally responsible notwithstanding the fact that the work was done for the benefit of the estate unless he stipulates and clearly indicates that he was acting for the trust and not in his individual capacity. But if you find that this plaintiff in dealing with this defendant knew or had cause or reason to know that at the time he entered into the negotiation of these two contracts he was dealing with him as the representative of the trust, or from the nature of their transactions that went along before that this plaintiff knew or should have known that the defendant was not to be held personally, then he cannot recover against him.' "

This, as far as we have searched, is the last word from any court on the subject. Observe this instruction says:

"If he didn't say something or do something";

and again:

"From the nature of their transactions that went along before that this plaintiff knew or should have known that the defendant was not to be held personally."

This is authority for admitting the concurrent dealings of the parties and the surrounding circumstances in cases of ambiguity. Upon this theory of the law and under substantially similar instructions, this case, as far as concerned the question of the contract and the intention of the parties thereto, should have been submitted to a jury.

If there were no further questions, the matter as to Kalman might end here. This question of contract construction was considered and argued at length both here and in the court below. We felt obliged to clarify our position respecting this question to which both parties have devoted so much time. We now come to the decisive question in this case as to Kalman. Respondent, Wm. Lindeke Land Company, although admitting that it consented to a modification in the terms of the lease and that it accepted benefits and payments under it as changed, contends that this agreement made with Mr. Stoughton is not valid but is a nullity because there was no consideration received by it for the reduction of the rental. The appellant Kalman contends that the change made in the terms of the lease by the respondent and Stoughton were without his knowledge or consent, that this secondary contract was based upon sufficient consideration, was thus binding on the respondent, and so had the legal effect of releasing Kalman. Supporting this contention it cites the case of Ten Eyck v. Sleeper, 65 Minn. 413, 67 N. W. 1026, 1028, wherein the court held that the great and unforeseen depression (1893) resulting in the lessee's inability to pay, and the probability that the premises would become vacant, impaired in value and not readily rentable, would constitute consideration for an agreement for reduced rental. The court said [65 Minn. 418]:

"It is * * * certain that he would vacate the building, and leave it idle or unoccupied, if the agreement for reduced rent and promise to repair had not been made. * * * From the plaintiff's own testimony, it is apparent that the hotel could not be rented for the sum of $500 per month. It was therefore a benefit to the landlord that the hotel should continue to be occupied with the new rental to be paid as agreed upon by the parties, and that, to this end, the landlord should make the repairs which he did. * * * The reduction of the rent and the making repairs induced the lessee to retain the occupancy and use of the building, and carry on the hotel business, which gave the landlord a rental therefrom; and, though at a reduced rate, yet the chances were that for some time

he would not have received any rent if the premises had not been retained by the lessee. As we have already stated, these facts show that the modified agreement rested upon a valid and sufficient consideration."

The record in the instant case presents all the essential elements of the Ten Eyck case. Respondent's contention therefore in effect asks this court to overrule that case, arguing that there was no consideration for the promise to reduce rents inasmuch as no consideration (money) was paid for such promise to reduce. There is some authority for such a view. In C. M. & St. P. Ry. Co. v. Clark, 178 U. S. 353, 20 S. Ct. 924, 928, 44 L. ed. 1099, the United States Supreme Court refers to such a rule as laid down in the old English case of Cumber v. Wane, 1 Strange, 426. In the Cumber case it was said [1 Strange, 426]:

"The plea was ill, it appearing that the note for 5£ could not be a satisfaction for 15£. * * * Even the actual payment of 5£ would not do, because it is a less sum."

The United States Supreme Court said [178 U. S. 364]:

"The rule therein laid down has been much questioned and qualified. * * * It is considered so far with disfavor as to be confined strictly to cases within it."

In other words, it should be confined only to those cases in which no other element appeared except the fact of the reduction of the amount of money to be paid. The court further said [178 U. S. 369]:

"The general principle applicable to settlements was thus expressed * * *. in Hagar v. Thomson, 1 Black, 80, 93, 17 L. ed. 41, 44: 'Much the largest number of controversies between business men are ultimately settled by the parties themselves; and when there is no unfairness, and all the facts are equally known to both sides, and adjustment by them is final and conclusive. Oftentimes a party may be willing to yield something for the sake of a settlement; and if he does so with a full knowledge of the circumstances,

he cannot affirm the settlement, and afterwards maintain a suit for that which he voluntarily surrendered.' "

Referring to Cumber v. Wane, 1 Strange, 426, 12 Harv. L. Rev. 524, 525, speaks of it as a medieval doctrine and says the quoted statement is "responsible for the greater part of the objectionable applications of the doctrine of consideration, whereby the reasonable expectations of business men have been disappointed." The doctrine was so distasteful to Americans that by 1899 at least ten states had abolished it by statute and several others by court decision. The Minnesota court has arrayed itself with the latter group in 1896 by the decision in the Ten Eyck case. In Russell & Barbour v. Lambert, 14 Idaho, 284, 94 P. 54, L. R. A. 1915B, 20, the court said (syllabus):

"Where parties have been doing business under a written agreement, and differences and contingencies arise which were not foreseen and provided for by the agreement, and they thereafter make an additional or subsequent agreement 'in order to avoid complications' and for the purpose of fixing a basis on which their settlement shall be had, the consideration for the latter agreement is sufficient in law, and will not be disregarded by the courts for want of consideration, although no pecuniary consideration passed. The settlement of disputes and fixing a basis on which such settlement shall be made is a sufficient consideration for an agreement or contract of compromise."

See note in L. R. A. 1915B, 1-70, for a further compilation of authority.

We believe the Ten Eyck case was decided upon sound reasoning and upon the more enlightened view of the law than the narrow view of consideration expressed in Cumber v. Wane, 1 Strange, 426. In the instant case we find that there was apparent mutual apprehension of the parties respecting the future of appellants' Eat Shop business; a changed financial condition; a careful examination of the facts by respondent; and a voluntary agreement to accept a lower rent. Instead of retreating from the reasonable

doctrine of the Ten Eyck case, 65 Minn. 413, 67 N. W. 1026, and turning to the medieval doctrine of Cumber v. Wane, 1 Strange, 426, we feel it an appropriate time to emphasize and reiterate our former ruling. We therefore hold that respondent, having investigated fully the lessees' inability to pay, there being no claim or evidence that it was misled on the facts bearing on the lessees' financial condition and having decided that unless the rent was reduced the lessees would probably fail to pay, close up the business, and leave the premises unoccupied, the respondent agreed to accept a lower rent, the lessees paid said lower rent, which was received by respondent in full payment of the monthly rental, that there was sufficient consideration for the secondary agreement to reduce rent, and that it is valid.

This secondary contract was made without the knowledge or consent of Kalman. At this point it must be apparent that had the plaintiff believed that Kalman was personally liable it would not have acted to modify or change the contract without his knowledge and consent. Kalman had been out of the transaction since 1925. This was 1931. Kalman did not learn of any modification or change in the contract until December 14, 1931. The business was losing money at the time of the modification of the contract. Between that date and up to the time of trial the business had lost $30,000. Had Kalman been advised of the intended modification of the contract and of the reasons which impelled plaintiff to assent to such modification and had he believed himself personally liable for rents, he might well have given serious consideration to the matter of protecting himself by appropriate action having an eye to the financial condition of the trust, its assets and liabilities, and the possibility of caring for deferred liabilities of which plaintiff's claim for rents under the contract was one, out of the fixed assets then remaining. He was given no such opportunity.

Under well established principles of law, we believe Kalman was released from any personal obligation to pay rent which he may have had. It is not necessary to decide whether or not Kalman became a surety. It is only necessary to determine what his duties and obligations were under the original contract and how they

were changed by the alterations of the contract. By entering into the arrangement changing the terms of the lease without consulting or asking the consent of Kalman, plaintiff recognized him to be no longer interested and by entering into a valid agreement with the remaining and successor trustees assumed a position inconsistent with the continued existence of Kalman's liability under the lease. Such acts on plaintiff's part amounted to a surrender of the lease as to defendant Kalman. A surrender terminates the relationship of landlord and tenant under a lease. Stern v. Thayer, 56 Minn. 93, 57 N. W. 329. Very analogous to the case at bar are those cases where a landlord deals with an assignee of the lessee and treats him as if he were thereafter the tenant. In such case it is held that the original tenant is released from further responsibility under the lease. Fifty Associates v. Grace, 125 Mass. 161, 28 Am. R. 218; see Levering v. Langley, 8 Minn. 82 (107).

In the present case the plaintiff landlord, with knowledge that Kalman had ceased to be a trustee, entered into an agreement for the reduction of rent with the new and continuing trustees. Certainly, if Kalman was a tenant or one of the tenants, the agreement would have to be made with him or with someone acting in his behalf before it could become a binding obligation. Recognition by plaintiff of the new trustee, dealing with the new trustee, entering into an agreement modifying and changing the terms of the lease with knowledge of the change in the trustees, and without the signature or consent of Kalman, is absolutely incompatible with the relation of landlord and tenant between plaintiff and Kalman. As a matter of law, then, Kalman was released from whatever obligation he may have had under the lease.

Defendant Stoughton notes various assignments of error based upon the failure of the court to direct a verdict in his favor or to submit to the jury under proper instructions the question whether he was personally liable or not. Defendant Stoughton assigns further error not important to a consideration and determination of his rights here and adopts a portion of defendant Kalman's brief as his argument and authority to support the assignments of error above adverted to. We dispose of the case as to defendant

Stoughton summarily in the light of what has already been said and hold that the order against him must be reversed. All that need be said as to him is that under the contract he specifically bound himself to personal responsibility for the performance of the contract for a specified period, to-wit: "during the first three years of the term reserved in said lease." This was the measure of the extent and the duration of his personal liability, and the same has not been changed. The action here is to recover rent for August to December, 1931, and January and February, 1932, three years after the expiration of the personal guaranty which Stoughton signed and which was attached to the lease. The mere fact that plaintiff exacted this personal guaranty from Stoughton shows beyond doubt that plaintiff did not consider defendant Stoughton personally bound on the contract. Otherwise the act of procuring the guaranty was mere surplusage. Under the rule *expressio unius,* Stoughton is entitled to judgment in his favor.

Order reversed and judgment ordered for defendants.

