**HOLT et al. v. BARNESVILLE FARMERS ELEVATOR CO.**

Civil Action No. 191.

District Court, D. Minnesota,
Sixth Division.

Sept. 13, 1943.

Leonard Eriksson, of Fergus Falls, Minn., for plaintiffs.

N. B. Hanson, of Barnesville, Minn., and W. E. Rumble and Edgar G. Vaughan, both of St. Paul, Minn. (Doherty, Rumble, Butler, Sullivan & Mitchell, of St. Paul, Minn., of counsel), for defendant.

NORDBYE, District Judge.

This action is brought to recover wages for overtime under Section 16(b) of the Fair Labor Standards Act of 1938, 52 Stat. 1060, 29 U.S.C.A. § 216(b).

The relevant facts appear to be as follows: The defendant, Barnesville Farmers Elevator Company, a corporation doing business under the cooperative laws of the State of Minnesota, has operated at Barnesville, Minnesota, during all the time relevant to this case. Although its principal business is the storing and buying and selling of grain, it also sells coal, wood, twine, seed, farming machinery, and farming machinery parts locally at retail. Plaintiffs were employed by defendant prior to October 24, 1938, the effective date of the Fair Labor Standards Act and the date upon

which plaintiffs allegedly began to suffer the damages and short wages for which they seek recovery in this action. Holt has been a steady employee, but Dahl has been employed only during the busy seasons and intermittently during the various other seasons.

For all practical purposes, the plaintiffs performed the same duties. They handled and prepared the grain for market; that is, when the grain arrived at the elevator, one of the plaintiffs weighed, tested, and graded it, had it dumped into the pits, and gave the one depositing or selling the grain a weight ticket showing the grain's gross weight, the amount of dockage and tare, and the grain's net weight. Holt or Dahl, by mechanical equipment, then elevated the grain from the pit to the elevator's bins. From the bins they put it through mechanical equipment for cleaning and then returned it to the bins in accordance with its grade. They also transferred the grain by mechanical means from one bin to another, and if any grain was moved to one of defendant's portable granaries, plaintiffs invariably operated the equipment which loaded the trucks which moved the grain.

Plaintiffs also sealed and loaded the railroad cars from the elevator and granaries, and they coopered the doors of the cars in which the grain was shipped. Sometimes they applied the "hammer test" to the cars to guard against leakage. Defendant's coal, wood, seed, twine, and farm machinery business was all local and at retail. Plaintiffs acted as salesmen with respect to that merchandise and also assembled the machinery and treated the seed prior to its sale. Occasionally, they weighed and sacked coal, seeds, feed, and twine.

The grain which defendant shipped was sold on either the Minneapolis or Duluth exchange. The railroad car was routed to Minneapolis from Barnesville, but it was held at St. Cloud, Minnesota, until the grain was sold. The purchaser took control of the car at St. Cloud immediately after he purchased the grain. The freight from Minneapolis or Duluth to the destination to which the purchaser shipped the grain was paid by the purchaser. Much of the grain was taken outside of Minnesota, and when defendant shipped the grain, the probability of the grain's leaving Minnesota without being taken from the car which left defendant's elevator and which contained the grain upon which plaintiffs worked was fully realized.

Upon these facts three issues have arisen: (1) Does Section 13(a) (10) of the Act exclude plaintiffs from the Act's protection? (2) Were plaintiffs engaged in commerce or in the production of goods for commerce? (3) How many hours did plaintiffs work for the defendant?

The parties recognize that, if the first question is answered affirmatively, or if the second is answered negatively, the plaintiffs cannot recover regardless of the number of hours which they worked, for plaintiffs were paid single time for every hour which they worked. This action deals with the question of time and one-half for overtime.

In his brief, plaintiffs' counsel discusses only the first two issues. Defendant's counsel discuss only the first issue in their brief. Apparently, counsel for both sides recognize that the retail coal, wood, twine, seeds, and farm machinery business is, by itself, unimportant and is relevant primarily because of the number of employees engaged in that work. Certainly, in so far as the record shows, plaintiffs were not engaged in commerce or in the production of goods for commerce with respect to that work.

Section 13(a) (10), 29 U.S.C.A. § 213(a) (10) provides: "(a) The provisions of sections 206 and 207 (sections 6 and 7) of this title shall not apply with respect * * * (10) to any individual employed within the area of production (as defined by the Administrator), engaged in handling, packing, storing, * * * preparing in their raw or natural state, * * * agricultural or horticultural commodities for market * * *."

There seems little doubt that the plaintiffs were engaged in "handling, storing, preparing in their raw or natural state, * * * agricultural or horticultural commodities for market." The Administrator has interpreted these duties in Interpretative Bulletin No. 14. 1 C.C.H. Labor Service, Par. 11,218, p. 11,304. In Paragraph 26, he said of the term "handling": "The operations included in this term appear to be those physical operations customarily performed in obtaining agricultural or horticultural commodities from producers' farms, transporting them to and receiving them at the establishment, weighing them or otherwise determining on what basis the producer is to be paid, placing them in the establishment where further operations are to be performed, and delivering the

commodities to warehouses. Specifically, these operations include loading the commodities in trucks, wagons, (etc.), in producers' fields or at concentration points, transporting them to the establishment, counting, or weighing, the commodities, assembling, binning, piling, or stacking them in the establishment, moving the bags, boxes, cases, barrels, bales, coops, or other loaded containers to wagons, trucks, railroad cars, or other conveyances, and transporting the commodities away from the establishment. Since it makes no difference that the employer does not own the goods being handled, the employees of brokers or commission houses who physically handle the goods may be within the exemption."

The Administrator discusses "storing" in the following terms: "28. Operations which appear to be included in this term are those involved in (1) placing agricultural or horticultural commodities in storage rooms or other places where the commodities are to be held prior to further preparation, sale, or shipment; (2) taking care of the commodities while they are being so held; (3) removing them from the storage rooms and transferring them to wagons, trucks, railroad cars, or other conveyances."

The Administrator declares that "preparing in their raw or natural state" means that:

"33. The operations included in this term may be any of a large number that are performed in connection with many different kinds of agricultural or horticultural commodities. They do not include operations which change the form of the commodity or which are performed after the commodity leaves its raw or natural state.

"The following examples will prove helpful in determining whether particular operations are included in the term: * * *

"3. Grain, seeds, or forage crops— Cleaning, hand picking, sorting, grading, fumigating, and mixing are included."

Reference to the statement of facts above will show clearly that the plaintiffs performed these duties set out by the Administrator as duties which place those performing them in an exempt class under the Act; that is, plaintiffs handled grain— they received the grain at the elevator, weighed it, binned it, cleaned it, loaded the trucks which transferred it to portable granaries, and loaded the railroad cars in which it was shipped to market. Plaintiffs

stored grain—they put the grain in the bins in which it was to be held until sold or shipped, they transferred it from one bin to another, and removed the grain to the railroad cars for transfer to market. Plaintiffs prepared the grain for market in its raw or natural state; that is, they cleaned and graded it. Consequently, it seems evident that, according to the Administrator's interpretation of the terms in question, plaintiffs performed duties which exempt them from the Act's protection if they performed these duties in the area of production, as defined by the Administrator. The Administrator's interpretations seem natural and reasonable. No good reason is urged why the Court should not accept and adopt them for this case.

█ Pursuant to the duty which Section 13(a) (10) imposed upon him, the Administrator has defined the phrase, "area of production". From October 24, 1938, until June 17, 1939, he declared: " * * * An employee was exempt under Section 13(a) (10) as employed in the area of production in handling, packing, storing, * * * preparing in their raw or natural state, or canning of agricultural or horticultural commodities for market * * * (2) if he was engaged in such operations upon agricultural or horticultural commodities obtained by the establishment where he was employed from farms in the immediate locality provided that not more than seven employees were employed." 2 C.C.H. Labor Service, Par. 25,751. From June 17, 1939, until April 1, 1941, the Administrator declared that the employee was employed in the area of production, as required by Section 13(a) (10) "(1) If the work was performed on materials all of which were obtained from farms in the general vicinity of an establishment which did not employ more than seven employees; * * *." 2 C.C.H. Labor Service, Par. 25,751. Since April 1, 1941, the Administrator has declared that an employee is employed within the area of production, as required by Section 13(a) (10): "(a) if he performs those operations on materials all of which come from farms in the general vicinity of the establishment where he is employed and the number of employees engaged in those operations in that establishment does not exceed ten."

All these definitions appear to be relevant to this case and applicable to the periods during which they were effective and which are included in the time covered by this

case. If the present definition is applied to the entire period involved in this lawsuit (October·24, 1938, to November 18, 1942), both parties will be held liable to a rule which was not the rule for the period for which it was applied. To govern the liability or right to recovery by rules which have supplanted those existing when the right or liability arose seems clearly unreasonable and violative of due process. Such a rule would determine liabilities or rights according to a rule by which neither party could shape his actions or even would have a chance to shape his actions, for the law did not exist when they acted. To apply the present rule to the entire period in question would seem to set a dangerous precedent and create a confusingly anomolous situation. Consequently, as counsel for both sides seem to assume by referring to all the definitions, it seems wise to apply each definition to that period in this case during which it was operative. See Lindeke Land Co. v. Kalman, 190 Minn. 601, 252 N.W. 650, 93 A.L.R. 1393; cf. Fleming v. Farmers Peanut Co., 5 Cir., 1942, 128 F.2d 404.

▬ It is apparent that these definitions differ in two respects: (a) The first definition required that the commodities come from the "immediate locality" of the establishment; the second and third definitions require that the commodities come from within the "general vicinity" of the establishment. (b) The first and second definitions require that not more than seven employees be employed by the establishment; the third definition raises that number to ten.

Therefore, the first problem is found in the question, Did defendant's grain come from the immediate locality of Barnesville, Minnesota, prior to June 17, 1939, and from the general vicinity thereafter?

The terms "immediate locality" and "general vicinity" are indefinite and general terms. Therefore, they must be interpreted in the light of the existing facts and circumstances. Holly Hill Fruit Products v. Addison, 5 Cir., 136 F.2d 323; Fleming v. Farmers Peanut Co., 5 Cir., 128 F.2d 404. "Immediate locality" appears to include a smaller area than "general vicinity", but in view of the facts and circumstances in the instant case, the difference appears to be immaterial. In the instant case, defendant was located in a heavy grain producing area. Good roads led to its door from many miles out in the country. In fact,

two main highways enter Barnesville and are intersected ·in the rural areas by good county and township roads. The farms from which defendant received grain during the years in question were located on or near these roads. Mr. Kieselbach, manager of the defendant elevator, testified that 98% of defendant's grain was delivered to it each year from within fifteen miles of the elevator. In fact, only six persons delivered grain to defendant during the time in question from farms located more than 20 miles from the elevator. None were further than 25 miles.

According to the evidence, the capacity of defendant's elevator appears to be fairly large. The immediate locality and general vicinity which it serves would seem to be commensurate with its size. No evidence shows that defendant was unable to accept all the grain delivered to it from the distances already mentioned. Consequently, it seems that the area of at least 15 miles was necessary to supply the elevator.

Whether the area of 25 miles can be considered to be within the immediate locality of the elevator may be questionable in some instances, but in view of the good roads leading directly to Barnesville, the heavy production of grain in the Barnesville area, the capacity of the elevator, and the fact that the "locality" and the "vicinity" of an establishment vanish by degrees, it seems to follow reasonably that the elevator was in the "immediate locality" and certainly in the "general vicinity" of the farms which were within 25 miles of the elevator and from which defendant received its grain. Indefinite definitions cannot be arbitrarily limited. Recognition should be given to the fact that they must be construed broadly to avoid limiting them unreasonably. See Fleming v. Farmers Peanut Co., supra. Consequently, it appears that defendant was receiving its grain from within the area of production in so far as the geographical requirements are concerned. Certainly, the fact that the defendant received all of its grain from within the comparatively concentrated area of twenty-five miles from the elevator shows that the people living in that area must have considered the elevator within their locality for marketing purposes. Although the decisions in other cases involving the area of production of elevators are of little value because each case necessarily turns on its facts, it seems significant that, in Remington v. Shaw, D.C.W.D.Mich.1942,

52 F.Supp. 465, the court held that the grain came from the "locality" of the elevator although it was produced at a distance of 35 miles.

In view of these facts, therefore, it seems clear that the grain in the instant case was produced and came from the immediate locality, and that therefore it came from the general vicinity of the defendant elevator.

 It will be observed that, according to the Administrator's definition, the defendant could not employ more than seven employees prior to April 1, 1941, or more than ten employees since that date, in order for its employees to be employed within the area of production. Defendant's evidence indicates that, for the weeks ending September 30, 1939, September 14, 1940, and February 8, 1941, it employed more than seven persons in its entire establishment. There is testimony of the plaintiffs to the effect that defendant employed more than that number during other weeks, but no definite dates, weeks, or number of weeks, are given. The plaintiffs appear to be indulging in mere generalities and guessing recollections when they testify in this manner. Consequently, no satisfactory conclusions or findings seem deducible from that part of plaintiff's testimony. The evidence is clear, however, that at no time did the defendant employ more than ten employees during any week, and the testimony is uncontradicted that at no time did defendant employ more than seven employees *in the operations on materials which came from farms in the general vicinity.* It seems reasonably clear that, when the Administrator refers to the number of employees employed, he refers to the employees engaged in the designated operations upon agricultural or horticultural commodities. Apparently, the Administrator assumed that a small concern engaged in such operations having not more than seven employees would have difficulty in competing with the larger concerns which could handle a greater quantity of agricultural or horticultural products and thus more readily absorb the increased labor costs occasioned by reason of the Act. However, in the instant situation, at the time when this defendant may have employed more than seven, the excess were not engaged in processing agricultural or horticultural products; they were engaged, according to the evidence, in the business of unloading coal, or other activities not connected with the type of operations which were designed to be exempt from the Act. In that at no time during the period in question did this defendant have more than seven employees engaged in the handling of agricultural or horticultural products, it would follow that these plaintiffs were at all times within the regulations promulgated by the Administrator. That this construction is consonant with the context of the present regulation is apparent from the last sentence thereof, which reads, in part, "and the number of employees engaged *in those operations* in that establishment does not exceed ten." (Italics supplied.) The prior regulations are not as clear in this regard, but they do not negative the conclusions reached herein, and the rationale of the entire situation requires a finding that the limit on the number of employees employed in the area of production necessarily refers to the operations carried on with reference to the agricultural or horticultural products. Any other interpretation would render the Administrator's regulations wholly arbitrary and without any possible relation to the authority granted by Congress. Certainly, the number of employees which an employer may engage in other activities seems wholly immaterial. Moreover, defendant claims that its employing more than seven persons during the three weeks mentioned is irrelevant because the Administrator lacked authority to define "area of production" in terms requiring not more than a designated number of employees to be employed. This argument seems to have merit, for Congress authorized the Administrator to define "area of production". See Section 13 (a) (10). "Area" relates to space. "Production" of agricultural and horticultural commodities relates to the growing of such commodities. See Webster's New International Dictionary. Consequently, it follows that when Congress empowered the Administrator to define the "area of production", it empowered him to define a geographical area. The Administrator, however, declared in effect that an employee is not employed in the given area unless the establishment which employs him does not employ more than the number which the Administrator designates. The mere statement of the power which Congress gave the Administrator and what the Administrator has done shows that the Administrator has exceeded his authority.

Consequently, to the extent which the Administrator has exceeded his authority, the definition cannot be followed.

Several cases have recognized this and have refused to apply that part of the Administrator's definition which declares that establishments which employ more than a designated number of employees cannot be considered as receiving goods from the area of production. See Fleming v. Farmers Peanut Co., supra; Felix Maestre et al. v. Cooperative Cafeteros de Puerto Rico, D.C.Puerto Rico 1942, 6 Labor Cases 61,515; Clark v. Jacksonville Compress Co., D.C.Tex.1941, 45 F.Supp. 43. Certainly, it is too well settled to require citation that a regulation promulgated by an administrative agency can be no broader than the regulation which it is authorized to promulgate. Gordon v. Paducah Ice Mfg. Co., D.C., 41 F.Supp. 980, 988, is the only case which appears to have sustained the Administrator's definition as to the employee requirement disputed here by defendant. In that case, the court sustained the requirement because "the record in its present shape throws no light upon the history or origin of the Administrator's definition, nor does it disclose what facts were considered by the Administrator in giving this definition."

But the history of the Administrator's definition and the facts which he considered in formulating the definition would seem to go only to its interpretation and construction, not to his authority to make the definition. Its origin lies in the authority bestowed upon the Administrator by the Congressional grant in Section 13(a) (10). The history which the Administrator has given to the definition and the facts which he considered in formulating it are irrelevant if Congress did not authorize him to include such factors in his definition. There is nothing in the legislative history in the Senate or House proceedings which reflects any intention of the legislative body to give the Administrator the power which is now questioned.

Since the plaintiffs are exempt from the protection of the Act by virtue of the exemption set forth in Section 13(a) (10) of the Fair Labor Standards Act of 1938, they cannot recover in this action. Therefore, it is not necessary to discuss the remaining issues. An exception is allowed.

Findings of fact and conclusions of law in harmony herewith may be presented on five days' notice by the defendant.