**S. T. McKNIGHT CO. v. CENTRAL HANOVER BANK & TRUST CO. et al.**

**CENTRAL HANOVER BANK & TRUST CO. et al. v. S. T. McKNIGHT CO.**

Nos. 11888, 11891.

Circuit Court of Appeals, Eighth Circuit.

May 16, 1941.

312

James E. Dorsey, of Minneapolis, Minn. (Leland S. Duxbury, Harry A. Blackmun, and Fletcher, Dorsey, Barker, Colman & Barber, all of Minneapolis, Minn., on the brief), for S. T. McKnight Co.

Franklin D. Gray, of Minneapolis, Minn. (Harold G. Cant and · Kingman, Cross, Morley, Cant & Taylor, all of Minneapolis, Minn., on the brief), for Central Hanover Bank & Trust Co. et al.

Before WOODROUGH, JOHNSEN, and VAN VALKENBURGH, Circuit Judges.

WOODROUGH, Circuit Judge.

The S. T. McKnight company is, and long has been, the owner of a half of Lot 9, Block 222, Hoag & Bell's Addition to Minneapolis, Minnesota, on South Sixth Street, in the downtown part of the city. In 1909 it executed a lease of the property for 100 years to Charles D. Collins, lessee. The lease was assignable and Collins promised, but failed, to assign it to John E. Andrus. By the decree in a suit for specific performance brought by Andrus against Collins and others in 1913, the lease was assigned to Andrus. In 1921 Andrus assigned the lease and transferred it in trust together with many other of his assets, and the Central Hanover Bank & Trust Company, Hamlin F. Andrus and William H. Taylor have succeeded to the Trust as trustees. The trustees remained in possession of the leased property until April 11, 1938, when they assigned their interest in the lease, vacated the property and denied further liability under the lease. The McKnight company brought this civil action against them to subject them in effect to the obligations of the lease for the term thereof and to recover from them for alleged breaches of the lease and certain related agreements, six causes of action being stated in separately numbered counts of the amended complaint. Issues having been joined, the court tried the case without jury, made findings of fact and conclusions of law, accompanied by memorandum opinion, and entered judgment in favor of the McKnight company on the third, fifth and sixth causes of action of the complaint and in favor of the trustees on the first, second and fourth causes of action. The parties have taken separate appeals from the parts of the judgment which were adverse to them respectively.

No. 11,888,
S. T. McKnight Co. v. Central Hanover Bank et al.
The Judgments Against the McKnight Company Upon the First, Second and Fourth Causes of Action.

It was alleged in the first cause of action of plaintiff's amended complaint that jurisdiction existed by reason of diversity of citizenship and requisite amount involved; that plaintiff was, and at all times referred to had been, the owner in fee of the described property; that on or about May 28, 1909, plaintiff, as lessor, and Charles D. Collins, an individual, acting for and on behalf of John E. Andrus, an individual, as lessee entered into and executed a written agreement (hereinafter called the lease) whereby plaintiff leased the leased premises to said lessee for the term of one hundred years from and after May 1, 1909; that the lease demised the half lot above described and contained among its provisions the following: "7. Each covenant, agreement and grant in this instrument made by the Lessor shall bind its successors and assigns and shall inure to the benefit of the Lessee's heirs,

executors, administrators and assigns, and each covenant and agreement in this instrument made by the Lessee shall bind his heirs, executors, administrators, and assigns, and shall inure to the benefit of the Lessor's successors and assigns."

It was also alleged that: "By judgment and decree made and entered on the 16th day of July, 1913, by the District Court in and for the County of Hennepin, State of Minnesota, in a consolidated action known as Case No. 126462, in which said John E. Andrus was plaintiff and Dyckman Hotel Company, a corporation, was defendant, and said John E. Andrus was plaintiff and said Charles D. Collins, Anna L. Collins, his wife, and Dyckman Hotel Company, a corporation, were defendants, it was adjudged and decreed that said Andrus was the owner of all the right, title, interest, and estate acquired by said Collins in and by said lease described in the preceding paragraph IV hereof, in the leasehold estate thereby created, and in the buildings situated on said leased premises; that said Collins and his wife, said Anna L. Collins, and each of them, had no right, title or interest in said lease or in the leasehold estate thereby created or in the buildings situated on the leased premises; that said Collins and his said wife should forthwith assign said lease to said Andrus. At all times after May 1, 1909, and until on or about December 30, 1921, said Andrus was in possession of and occupied the leased premises, either by and through the said Collins acting on behalf of the said Andrus, or in his own person."

It was further alleged that on December 30, 1921, Andrus created the trust of which defendants have become trustees by succession and conveyed to the trustees the property and assets sometimes called the Trust Estate "subject to any and all other obligations of any kind or nature then existing against said Andrus, which obligations were to be paid from the Trust Estate"; and that the lease, together with the other assets, was assigned and conveyed to the trustees who "accepted said lease and entered into possession and occupation of said leased premises and thereby assumed all the covenants and obligations of the lessee under said lease for and throughout the entire term thereof". Alleging that it was informed and believed that the property held by the trustees under the Deed of Trust was sufficient to pay all the obligations of Andrus under said lease, the

McKnight company asserted that it had demanded from the trustees the rent due under the lease for the quarter-year extending from May 1, 1938, to July 31, 1938, inclusive, the amount of $937.50, but that this amount had not been paid in full or in part by the trustees.

In the second cause of action the McKnight company repeated the allegations of the first cause of action and asserted that rent was due from the trustees for the next quarter, August 1, 1938, to and through October 31, 1938, and that although demanded, it remained unpaid.

In the fourth cause of action McKnight repeated the allegations of the first cause of action, omitting reference to non-payment of rent and asserting that the terms of the lease required the lessee to keep the building on the premises insured up to a specified amount against loss by fire; that on May 24, 1938, the trustees had cancelled the fire insurance theretofore taken out and carried by them in respect to said building, "and continuously ever since said date said building has not been insured by defendants against loss by fire in any amount."

The McKnight company prayed that it recover judgment against the trustees for the amounts due as rent stated in the first and second causes of action, with interest and costs; and as to the fourth cause of action, it prayed alternative relief, either that the court determine the cost of insuring the building in accordance with the terms of the lease and require that the trustees effect the insurance, or that the court refer the matter to a master and decree that the trustees pay an amount equal to the cost of insurance.

The trustees answered these causes of action, admitting execution of the lease by the McKnight company to Collins, but denying that Andrus was ever lessee of the lease or that Collins had acted for or on behalf of Andrus in becoming lessee of the lease. They admitted that Andrus had brought action for specific performance against Collins in the state courts of Minnesota, which action terminated in a decree that Collins assign the lease to Andrus, that Andrus received the lease under the assignment so decreed and took possession, and subsequently, on December 30, 1921, assigned the lease to the trust, and that the trustees were in possession of the leased premises from December 30, 1921 to April 11, 1938. They asserted that on

April 11, 1938, they assigned the lease to one George Dam, and vacated the premises on that day, disclaiming further interest in the lease or premises, as to all of which they gave notice to McKnight company by written instrument dated April 27, 1938. The trustees demanded judgment dismissing the McKnight company's action and for their costs.

The district court found the ownership of the realty in the plaintiff and that plaintiff had executed the lease to Collins and that its terms are as alleged in the complaint; that Collins was not the agent of Andrus in procuring the lease, and that Collins and not Andrus is lessee of the lease; that it had been adjudged and decreed in the case of Andrus v. Collins in the State court that Collins and his wife should assign the McKnight lease to Andrus, and that by the decree the lease was assigned to Andrus; that Andrus occupied the leased premises as assignee of the lease from July 16, 1913, to December 30, 1921, and that Andrus then transferred it, among other assets, to the trustees then acting, also executing an assignment of the lease to them, the whole trust conveyance being "subject to the payment of any and all federal income taxes now or hereafter assessed against the grantor for any year prior to the calendar year 1922, and any and all other obligations of any kind or nature now existing against the grantor, which taxes and obligations are to be paid from said trust estate, the trustees, however, assuming no personal liability therefor." That the trustees occupied the leased premises as assignees of the McKnight lease from December 30, 1921, until or about April 11, 1938. On that date they assigned the lease to one George Dam, causing the instrument of assignment to be recorded and notifying the plaintiff thereof and also notifying the sub-tenant of that portion of the premises in occupancy that all payments of rent subsequent to April 11, 1938, should be paid to said George Dam and not to defendants, and defendants have not since said assignment exercised any control over the premises. That the assignment to George Dam was complete and valid and defendants have not since the execution thereof had any interest in the lease or the leased premises. The court concluded as a matter of law that Andrus was a bare assignee only of the lease and at no time contractually liable to plaintiff for performance of the covenants thereof. That

the interest of Andrus terminated upon his assignment thereof to the trustees; that the provisions of the trust conveyance imposed no liability upon the trustees in respect to rentals or other payments to become due under the lease in the future; that the trustees became bare assignees only of the lease and were never contractually bound for the performance of the covenants and that their assignment of their interest to George Dam on April 11, 1938, was valid and terminated all their interest. They were therefore not liable for the payment of any rent after that date, nor obligated to plaintiff in respect to subsequent fire insurance on the building. Judgment dismissing the causes of action followed accordingly.

We consider first the contention made by the McKnight company: That in the McKnight lease to Collins, Andrus was an undisclosed principal or beneficiary of a trust, and that Collins was a straw man, agent or trustee, and that Andrus therefore became and continued to be contractually bound to the performance of the covenants for the one-hundred year term of the lease.

To support the allegations of its complaint from which the contention derives, the plaintiff adduced in evidence on the trial a lease executed by Andrus to Collins in May, 1909, covering property adjacent to the McKnight property, in which lease Collins agreed, among other things, that if he procured a lease of the McKnight property which controlled the light and air on one side of the property demised to him, he would forthwith on demand assign said lease to Andrus or his nominee, subject to the terms and conditions of said lease. Plaintiff also offered in evidence the pleadings, the recorded notice of lis pendens, the findings of fact and conclusions of law and the judgment and decree in the certain consolidated actions brought by Andrus against Collins, his wife and the Dyckman Hotel Company in the District Court of Hennepin County, Minnesota, in 1913, pleaded in the complaint herein. Also part of the brief for Andrus as appellee in the appeal taken from the judgment and decree to the Supreme Court. In one of the actions Andrus sued to recover rent due under the lease he had executed to Collins, and in the other he sued to compel Collins to specifically perform said promise to assign to him the lease of the McKnight property which Collins had procured from the McKnight company but which he had

refused to assign. The decree directed such specific performance, and on the appeal the Supreme Court affirmed, Andrus v. Collins, 126 Minn. 417, 148 N.W. 566.

Plaintiff called no witnesses to support the allegations of its complaint that Collins had entered into the McKnight lease "acting for and on behalf of John E. Andrus as lessee", but sought to sustain the same by the judgment and decree and portions of the proceedings in the actions between Andrus and Collins, above referred to.

Although the court received the proffered parts of the record in the state court litigation in evidence, it was done subject to objection, and the effect given to the evidence by the court was indicated in its memorandum opinion which the court directed should be "filed with and become a part of the findings of fact and conclusions of law herein." The court said:

"The plaintiff here was a complete stranger to the Andrus-Collins litigation in the state court and acquired no rights because of it. Neither the subject matter nor the parties involved in that litigation are the same as the subject matter or the parties in the instant case. Therefore, the findings and judgment in that case may not be used as evidence here for the purpose of establishing that Collins, a party to the McKnight lease, made that lease not for himself but as a trustee for Andrus. The state court judgment was not binding on the McKnight Company and it may not dispense with its proof otherwise required by tendering proof of such judgment as determinative of the liability of Andrus and his successors. In effect that judgment and decree arose out of an effort to compel one who refused to keep his bargain to perform the same. It was for specific performance and not to declare Andrus the lessee. That judgments are not evidence against strangers to the actions producing them, that is, persons who are not parties or their privies, and are therefore not admissible to establish the facts on which they are based, is held in the following Minnesota cases: County of Olmsted v. Barber, 31 Minn. 256, 17 N.W. 473 [944]; Hartman v. Weiland, 36 Minn. 223, 30 N. W. 815; Lamont v. Lamont, 128 Minn. 525, 151 N.W. 416: Ikenberry v. New York Life Ins. Co., 127 Minn. 215, 149 N.W. 292.

"'A person who is not a party, nor in privity with a party, nor in any way concerned with a suit cannot rely on the judgment as res adjudicata but must prove the facts on which he relies as if the prior suit had not been brought.' 34 Corpus Juris, 1046, Sec. 1480. See also pertinent opinion in Maloney v. Finnegan, 40 Minn. 281, 41 N.W. 979. Also McGreevey v. Boston Elevated Railway Co. [232 Mass. 347], 122 N.E. 278, and Whipple v. Fardig [109 Conn. 460], 146 A. 847."

We think that the Minnesota cases cited by the District Court fully sustain its declarations of law and that the judgment and decree pleaded and relied upon by the plaintiff were not competent to establish the allegations of the complaint that "plaintiff as lessor and Collins acting for and on behalf of Andrus, as lessee" had "entered into and executed" the lease in question.

But it does not appear from the record that the District Court excluded entirely all of the exhibits disclosing the portions of the judgment roll and bill of exceptions in Andrus v. Collins offered in evidence on the trial of this case. It clearly appears from the court's opinion as a whole that after declaring as above set forth that the findings and judgment in the case could not be used by the McKnight company to establish the facts upon which it was based, the court studied all the exhibits to ascertain whether admissions could be found therein attributable to Andrus to sustain the McKnight company's allegations that Andrus and not Collins was the real lessee in the lease. It is not contended for the McKnight company that the judgment in Andrus v. Collins constituted estoppel by adjudication in this case. There could be no ground for such contention in view of the law in Minnesota. The whole theory was, and is, that the judgment roll and record disclosed admissions attributable to Andrus admissible as such against the successors in interest of Andrus.

Without assuming to make a definition of the Minnesota law in respect to the appellant's theory, we also have studied all of the exhibits, and our determination coincides with that of the trial court that the fair inference to be drawn from them is that Collins and not Andrus was the lessee in the McKnight lease.

It appears that in 1909, Collins, a hotel operator, approached John E. Andrus, a landowner and investor, and proposed to Andrus that Andrus should construct a suitable building upon and lease a certain down town Minneapolis business property to Collins for hotel purposes. Andrus

316

thought that the hotel venture could not succeed if the owner of the McKnight property next adjacent were free to cut off necessary light and air. A real estate dealer, Thorpe, who was to become interested in the hotel business with Collins, went to McKnight Company in the capacity of Andrus's agent and inquired whether the McKnight company would sell their property to Andrus. The McKnight company said the property was not for sale but could be obtained on a long term lease. Andrus was not willing to undertake the liability of a lessee in a long term lease and was prepared to let the whole transaction fail. In subsequent negotiations with McKnight company, Thorpe found that the McKnight company did not care who was to undertake liability on the long term lease if it could be assured that the building which stood on its property was paid for and maintained at a value of $25,000, an amount in excess of its then worth, which was supposedly $15,000, but left for exact ascertainment by appraisers. The McKnight company was willing to accept the credit of Collins as lessee if Andrus would guarantee the payment of the purchase price of its building and the maintenance of the improvements on the property at the value of $25,000. Andrus agreed to this. Collins was to rent Andrus's property for a 30-year term, and in the lease to him from Andrus he agreed to assign the lease of the McKnight property to Andrus. The transactions were reduced to writing, the McKnight company executed the lease to Collins and the surety bond to the McKnight company in the sum of $25,000, guaranteeing payment for the building and maintenance of improvements on the property, was signed by Collins as principal and Andrus as surety. The instrument for assignment of Collins's lease to Andrus was simultaneously prepared, but through inadvertence was not executed by Collins at the time. Some four years later, in 1913, Andrus discovering the inadvertence, requested Collins to execute the assignment, but Collins had had financial difficulties with his hotel business and attributed some of his losses to Andrus. He refused to assign the lease as he had agreed to do, and Andrus brought the action in the District Court of Minnesota to compel specific performance of the agreement to assign. Collins contested the action, denying Andrus's right to an assignment of the lease.

The prayer of the petition in Andrus v. Collins, "That the defendants Charles D. Collins and Anna L. Collins be required to assign said lease by proper assignment to this plaintiff", was granted by the trial court, and on appeal the Supreme Court, describing the suit as a suit for specific performance of contract, affirmed the decree. There was nothing in the petition of Andrus suggesting that any kind of alteration should be made in the lease or that it be reformed to make Andrus instead of Collins the lessee therein. Collins pleaded in the action that he was himself the owner of the lease and that he had not made any binding agreement to assign it to Andrus.

It appears that Samuel S. Thorpe, who acted as the agent of Andrus in negotiations concerning the McKnight property, testified in Andrus v. Collins:

"Q. Now, Mr. Thorpe, when did you first meet Mr. Collins in respect to the matter of the proposed Dyckman Hotel? A. I met him in January 1909.

* * *

"Q. Now, at that time did you have any talk about the matter of the McKnight lease,—the McKnight property? A. Yes, sir.

"Q. What talk did you have with Mr. Collins at that time? A. Well, I told him that Mr. Andrus would not advise, I think it was safe to say, would not advise to do anything at all unless he had that McKnight property secured or that he could control it so they wouldn't shut out our light. That Mr. Andrus had asked me to see if the property could be bought, and if so at what price, and what could be done, and to let him know. And we took up the negotiations with McKnight, and there was some suggestion made—

"Q. Well, you say 'we'; who was it? A. Well, Thorpe Brothers took up the negotiations with Mr. McKnight. I saw Mr. McKnight myself, and told him what we wanted, asking him for a price. And they told us what they would do, that they would make a hundred year lease, and that we should pay cash for the present building, and must guarantee to maintain improvements there to the value of say twenty-five thousand dollars. There was a tenant in the building at the time, whose term ran for about two years.

* * *

"Q. Mr. Thorpe, after Mr. Collins arrived here was anything further done in respect to the McKnight lease,—any talk with him in respect to the matter of the McKnight lease? A. Yes, sir, we had a

form of lease prepared that would cover the proposition of taking a lease of that property.

"Q. Now, did you have any talk with the McKnight people in the office of the McKnight company about the matter, at that time, about making a lease of the McKnight property? A. Yes, we had a talk about it.

"Q. Who was that talk with? A. Well, the talk was with Mr. McKnight, and Mr. Palmer; Mr. Palmer is the secretary of the S. T. McKnight Company; and I talked with both Mr. McKnight and Mr. Palmer—mostly with Mr. Palmer.

"Q. Mostly with Mr. Palmer; did you have Mr. Collins with you when you went there? A. No, I don't think I ever took Mr. Collins to McKnight's office. I don't think I did.

"Q. Were they willing to make a lease on that basis with Mr. Collins,—on the basis of $1,000.00 down and the balance as suggested in your letter that you wrote to him? A. No, they were absolutely unwilling to make that kind of a lease. They were willing to make a lease to Mr. Collins, if Mr. Andrus would guarantee the payment of that building, and guarantee the conditions requiring them to keep twenty-five thousand dollars' worth of improvements on the property, but absolutely would not consider the making of a lease otherwise.

"Q. That is, that improvements to the value of $25,000.00 should be put on that property? A. Yes, sir.

"Mr. Mercer: No, he didn't say put on, he said kept on.

"Q. Well, kept on. Now, did you have any talk with the McKnight people along that line? What did you say to them in respect to that proposition? A. Well, I told the McKnight people that Mr. Andrus was building,—or considering building for Mr. Collins, and if he did, he would want to control the light on this property, and that if he took a hundred year lease—he didn't wish to sign a hundred year lease, that he had never done that in his life, but that we might ask Mr. Collins to make the lease, and that Mr. Andrus then would secure,—that Mr. Andrus would guarantee that the building would be paid for, and that part of the lease that required to keep on $25,000.00 worth of improvements, would be carried out."

* * *

"Q. Now, Mr. Thorpe, was there at that time, any conversation at which they expressed themselves as to whether or not they would be satisfied,—that is, Mr. Palmer of the McKnight people, whether they would be satisfied with such an arrangement whereby Mr. Collins would be a tenant, and the lease be signed by Collins and by Andrus to guarantee the payment of the building? A. They said they didn't care who signed the lease as long as Mr. Andrus was on a guarantee to pay for the building, it made no difference to them. It made no difference to them as long as Mr. Andrus was on a guarantee to pay for the building.

"Q. Was anything said at that time about the lease to them, that it was contemplated the lease would be assigned to Mr. Andrus? A. Yes, sir, I told them that."

Mr. Andrus testified in the same case on his own behalf:

"Q. You didn't give a bond for the payment of rent then? A. I gave a bond for the payment of the building.

"Q. Just the building? A. Yes.

"Q. And not for the payment of rent? A. No, no bond for that.

"Q. So you are not obligated for the payment of the rent. A. I am not obligated for the payment of the rent.

"Q. In any way? A. In any way,—I so understand it.

"Q. Then you would not want this lease assigned to you, and you assume the obligations I suppose for the hundred years in the future? A. I will take my chances on that.

"Q. You will take your chances on that? A. Oh I will take my chances on that because any time it is burdensome I can drop it.

"Q. But you were not willing to take it in the beginning. A. I was not willing to assume a lease and sign my name to it, and Mr. Collins was, and as he was willing, the willing and the unwilling got together, we met, and the thing was done.

"Q. You thought it was perfectly all right for Mr. Collins to sign that lease? A. He volunteered to do it."

The trial court found in the same case: "23. That at the time of the making of the lease hereinbefore referred to by the plaintiff to said defendant Charles D. Collins, the plaintiff was unwilling to enter in-

318

to said lease without controlling the said property above referred to as the McKnight property, on account of the fact that he was unwilling to build a hotel in pursuance of the provisions of said lease without controlling the light and air over said McKnight property. That the S. T. McKnight Company were unwilling to sell said property, but were willing to give a hundred year lease thereon. That said plaintiff [Andrus] was unwilling to himself execute, as lessee, a lease of said McKnight property, but was willing to execute the lease with said Charles D. Collins hereinbefore referred to, provided such lease of said McKnight property was executed by some other person as lessee and the same should then be assigned to the plaintiff. And the said plaintiff was willing to then make a lease of said McKnight property to the said Charles D. Collins on the basis as hereinafter set forth in the portions of the lease made by said plaintiff to the said Charles D. Collins hereinafter set forth. That the said Charles D. Collins thereupon offered and agreed with the plaintiff that if the plaintiff would enter into the said lease as lessor to the said Charles D. Collins as lessee of said Dyckman Hotel property, he, the said Charles D. Collins would forthwith assign the lease, if he obtained the lease, on said McKnight property, to said plaintiff or such person as the plaintiff might designate."

In the brief for Andrus filed in the appeal to the Supreme Court, the following appears:

"Mr. Andrus did not himself wish to sign a lease, but the McKnight Company was willing to make the lease to any tenant provided Mr. Andrus would guarantee the payment for the buildings at the expiration of the balance of the term of the outstanding lease, and guarantee the bringing of the value of the improvements up to the required value of $25,000.

"The matter of the form of the proposed lease was accordingly taken up and agreed on between the attorneys for Mr. Andrus and the attorneys for the S. T. McKnight Company. * * *

* * *

"Mr. Andrus stated to Mr. Collins that except as the McKnight property could be controlled by him, he, Mr. Andrus, would not consider the matter of the proposed hotel at all; that he was advised that the McKnight Company would not sell the property but would lease it for a hundred years, but would require the buildings to be purchased at their value on the expiration of the then outstanding lease; that he was himself averse to signing a lease as a tenant. Mr. Collins then stated that the matter of signing the lease need not stand in the way of the deal, that he would sign a lease and assign it over to Mr. Andrus.

* * *

"At the time the lease on the Dyckman Hotel property was signed up, the McKnight lease had not been signed. It was all ready for signatures except the filling in of the appraised valuation on the buildings, which was to be paid to the S. T. McKnight Company in October, 1911. By consent of Mr. Andrus and the McKnight Company, the fixing of the value was left to Mr. Haglin, who fixed it at $17,800, and later in the month of May, and after Mr. Andrus and Mr. Taylor had gone back east, this amount was filled in in the McKnight lease and Mr. Palmer of the S. T. McKnight Company came over to Thorpe Bros.' office and Mr. Collins signed the lease and it was afterwards signed by the officers of the McKnight Company, who understood that Mr. Collins was signing it only for the purpose of turning it over to Mr. Andrus. At the time of the delivery of the lease they received a bond covering the payment of the buildings, signed by Mr. Collins as principal and by Mr. Andrus and Mr. Thorpe as sureties, which was for the sum of $25,000."

We think the matter above quoted fully sustains the finding and conclusion of the trial court expressed in its opinion in this case: "I conclude for the following reasons that Collins and not Andrus was the lessee in the McKnight lease. Collins made the McKnight lease and was acceptable to the McKnight interests as lessee. There was no secret of the fact that Andrus would not become personally liable on the covenants of a hundred year lease. The evidence justifies the conclusion that the whole deal would be called off if such was insisted upon. Collins, on the other hand, was willing so to become bound and it was vital to him that the deal not fail. He had an important interest in its consummation since he was to have a thirty year lease on the Dyckman Hotel when built by Andrus and Andrus wouldn't build unless he secured control of light and air to be provided by the leasehold of the McKnight premises. Andrus was willing to become a bare assignee in possession, liable

for rental and other obligations provided in the lease during such possession by him, which he could terminate by assignment to someone else. There was apparent and deliberate purpose in these activities on the part of Andrus."

We see nothing in the record of Andrus v. Collins to support the contention that Andrus was an undisclosed principal in the McKnight lease. On the contrary, the negotiations that led up to that lease were conducted with the McKnight company by the agents of Andrus. The interest that Andrus had in respect to the light and air controlled by the McKnight property was disclosed and what Mr. Andrus was willing to do and what he was unwilling to do was also disclosed. The McKnight company "didn't care who signed the lease as long as Andrus was on a guarantee to pay for the building." Andrus performed the part of the agreement on his part to be performed by entering into and performing the guarantee.

On the question of undisclosed principal, the situation is closely analogous to that considered by this court in Heart of America Lumber Co. v. Belove, 8 Cir., 111 F. 2d 535, 538, annotated in 130 A.L.R. 658. In that case a corporation sued a lessor to recover damages for breach of covenant of a lease. It appeared that the lease ran to an individual and not to the corporation and that the corporation by written endorsement upon the lease guaranteed the performance of its obligation by the named lessee. We said: "By the recitals in the lease and by the guarantee, the relationship and the status of the parties were fixed and determined. The defendant, Sarah B. Belove, was the lessor, J. E. Turner was lessee, and Heart of America Lumber Company was guarantor."

Here the contemporaneous execution of the lease and the guarantee agreement [1] considered with the negotiations in the transaction make the intentions of the respective parties clear. Andrus was, and was intended to be, the guarantor of the obligations respecting the improvements thereon. Such guarantee was an integral and essential part of the whole lease agreement without which McKnight would not

have agreed to lease the property to Collins and Andrus would not proceed on his part without such lease being made.

We find no merit in the contention that Collins was a mere agent or straw man for Andrus. On the contrary, Collins was undertaking heavy obligations in respect to the hotel enterprise and had a vital interest in the control of the air and light above the adjacent McKnight property. He acted for himself in becoming lessee and each of the respective undertakings between himself and Andrus were clearly defined by their contracts. There was no agency and Collins was not a "dummy." [2]

The contention is elaborated that Collins was trustee for Andrus, that the trust was a dry trust without functions and therefore Andrus should be found to be the real lessee in the McKnight lease. The argument is derived mainly from certain allegations in the pleadings, findings and conclusions of the court and arguments of counsel in Andrus v. Collins litigation. It was testified on the trial of this case by an attorney who appeared for Andrus in that case that when that suit was brought it was considered that the hotel corporation operating the hotel property as assignee of the lease from Andrus to Collins was insolvent and both Collins and his wife were refusing to execute the promised assignment of the McKnight lease to Andrus. The attorney explained that "the question that came up in starting the suit was, how I could make this interest in Mr. Collins free from his wife's interest and I figured that the only way that could be done was to charge him as a trustee, and I thought that the facts as set forth sufficiently charged him as a constructive trustee with respect to the matter of not having carried out his agreement; and so I combined in this action, which is one for specific performance, a claim that these facts that are alleged constitute the property insofar as it stood in Mr. Collins' name, as being held by him in trust for the purpose and to the extent required to carry out his contract."

This testimony is consistent with the findings in the Andrus v. Collins case which were drawn and submitted by the same at-

---

[1] See Short v. Van Dyke, 50 Minn. 286, 52 N.W. 643.

[2] The Supreme Court of Minnesota said, in Gay v. Kelley, 109 Minn. 101, 123 N.W. 295, 297, 26 L.R.A.,N.S., 742, "Of course, if an agent at the time of the making of a contract discloses the name of his principal, and the contract is then made with the agent alone, the person making the contract cannot maintain an action upon it against the principal. So held in Silver v. Jordan, 136 Mass. 319."

torney, and with arguments màde by counsel for Andrus on the appeal. There was no implication in either of them that the lease, itself was in any respect whatever other than is shown upon its face—a valid and complete lease from McKnight to Collins. But Collins having undertaken and bound himself to assign it and a large enterprise involving heavy outlay having been carried on in reliance on the existence of the lease to Collins and upon his promise to assign it, the theory of his being a trustee charged in equity with the duty to make the assignment he had agreed to make was not inconsistent with the defense to the present action. The conclusion that by reason of his agreement to assign the lease Collins was without right, title or interest in it, and was a trustee for Andrus and as such obliged to assign it to Andrus, was not intended to and did not operate to substitute Andrus for Collins as lessee. Such resort as there was to the doctrine of constructive trust was only to more effectually enforce the performance by Collins of his duty to make Andrus the assignee of the lease. Andrus had the right to be put in the position of assignee and the sole intent and purpose of the decree was to effectively enforce his right.

We affirm the decision of the trial court that Collins was the lessee of the McKnight lease and that Andrus became the assignee thereof. As such assignee he was bound to the lessor by privity of estate only and obligated to perform the covenants of the lease only while he was in possession of the leased premises. Cohen v. Todd, 130 Minn. 227, 153 N.W. 531, L.R.A.1915E, 846; Trask v. Graham, 47 Minn. 571, 50 N.W. 917. In 1921 he assigned the lease to his trustees and they likewise became obligated to perform the covenants only while they were in possession.

It is ·contended that a different conclusion should be reached on account of the provisions of paragraph 7 of part 3 of the McKnight lease: " * * * and each covenant and agreement·in this instrument made by the Lessee shall bind his heirs, executors, administrators and assigns, and shall inure to the benefit of the Lessor's successors and assigns," and the provisions of the assignment by which Andrus assigned the lease to the trustees: "subject to the payment of any and all Federal Income taxes now or hereafter assessed against the Grantor for any year prior to the calendar year 1922, and any and all other obligations of any kind or nature now existing against the Grantor, which taxes and obligations are to be paid from said Trust Estate, the Trustees, however, assuming no personal liability therefor."

But we are not so persuaded. We agree with the declaration of the trial court: "That the words 'subject to all the terms and conditions of said lease' do not impose contractual liability on an assignee to a lessor to carry out the covenants of a lease, seems to be the well supported rule. That they are words of qualification and not of contract appears to be well settled. See Wolveridge v. Steward, 1 Cromp. & M. 644. Also Consolidated Coal Co. v. Peers, 166 Ill. 361, 46 N.E. 1105 [38 L.R.A. 624]; Meyer v. Alliance Investment Co., 84 N.J.L. 450, 87 A. 476. If we look for analogy to cases where land is conveyed subject to a mortgage, we find that Minnesota, in common with many other states, holds that land conveyed subject to a mortgage does not render the grantee personally liable unless by agreement he promises to pay or assume the debt. Clifford v. Minor, 76 Minn. 12, 78 N.W. 861. Manning v. Cullen, 50 Minn. 568, 52 N.W. 973."

It is further contended that the trustees must be held to have assumed contractual obligation to perform the covenants of the lease by the provisions of the trust indenture which made the conveyance "subject to the payment of any and all other obligations of any kind and nature now existing against the grantor which obligations are to be paid from said trust estate." We find nothing in this provision indicating any intent on the part of the grantor Andrus to impose upon the trustees to whom he transferred the lease and his other property, any greater or different obligation in respect to the McKnight lease than he had himself. He was obligated only as an assignee of the lease and he assigned the lease to the trustees. His "existing obligation" was that of a bare assignee to perform the covenants and pay the rent only while he was in possession. Their obligation remained the same.

A further contention is that the assignment of the lease which the trustees made to George Dam was colorable merely and a sham in that George Dam was admittedly an impecunious person, employed by one of the trustees as a chauffeur, having no financial responsibility and no real intention to take actual control of the prop-

erty or to carry out the lease. The contention was fully considered by the trial court and we find no error in its conclusion.

"With reference to the assignment to Dam: That such an assignment may be made to one without financial or other responsibility in the absence of circumstances obligating the lessee contractually to the lessor, 'absurd as it may seem to the modern and sensible aversion to anything which smacks of sham, it remains law that an assignee of a lease may, by assigning it, even to a pauper, put an end to his liability in point of time', has been held to be the rule in Minnesota in the case of McLaughlin v. Minnesota L. & T. Co., 192 Minn. 203 [255 N.W. 839]. Being of the view that there was no contractual assumption of liability for the future payments of rent or the performance of covenants undertaken by the defendants in the trust deed or otherwise, and that no lien exists, the defendants were in my opinion within their rights in making the assignment to Dam, as a consequence of which the first two causes of action of the plaintiff must fall. For like reason the defendants are not liable for failure to insure the building after May 24, 1938, the date of the cancellation of the insurance."

The trustees did not retain possession of the premises or receive profit from them after their assignment to Dam, and were not receiving any benefits under the cloak of its protection. The assignment was valid to terminate their liability as assignees of the lease. National Bank of Commerce v. Dunn, 194 Wash. 472, 78 P. 2d 535, 544; Adams v. Koehler & Co., 136 App.Div. 623, 121 N.Y.S. 390, 392; Tate v. McCormick, 23 Hun 218; Hartman v. Thompson, 104 Md. 389, 403, 65 A. 117, 118 Am.St.Rep. 422, 10 Ann.Cas. 92; 16 R.C.L. 866, § 369.

The judgment and decree on the first, second and fourth causes of action is affirmed.

## No. 11,891,
## Central Hanover Bank, et al. v. S. T. McKnight Co.
## The Judgment Against Trustees on the Third Cause of Action.

The judgment on this cause of action is for the amount of unpaid installments of special assessments levied against plaintiff's leased property in the years 1921, 1923, 1925, 1927, 1928 and 1932. The allegations of the complaint were: "In the years 1921, 1923, 1925, 1927, 1928 and 1932, there were duly and specifically assessed against the leased premises for specific improvements the aggregate amount of Five Hundred Eighty-four and 90/100 Dollars ($584.90), on all of which interest has long since become payable, as provided by law. No part of such assessments has been paid by the defendants, or any one else, except the aggregate amount of Three Hundred Thirty-Seven and 78/100 Dollars ($337.78)." To which there was general denial. The trial court found that the assessments had been made and levied against the premises in each of the years for "specific improvements" and that certain portions of said assessments with interest at the rates specified remain unpaid [3] and gave judgment for the aggregate amount of $230.52. The special assessments could be paid in annual installments at the time of payment of the annual real estate taxes by virtue of Sections 1 and 2 of Chapter 295 of the 1913 Session Laws of Minnesota, and it was made the duty of the county auditor to include one of the annual installments of the principal amount of the assessment with and as a part of the taxes on the land for each year.[4]

There was no claim that the trustees had not paid all of the installments that accrued during the period of their occupancy, and the trustees contend that they had satisfied the requirements of the lease by such payment of the installments accruing during their occupancy. The lease provided: "The Lessee, in lieu of additional rents, will pay all taxes and assessments of every kind and nature, which shall by whatever authority or for whatever purpose, during said term, be levied, assessed, imposed or extended, upon or against said premises or any part thereof, or upon or against any building, structure, or improvement now or hereafter on said premises, beginning with the taxes and assessments for the year 1909, including all

| [3] | | | | | |
|---|---|---|---|---|---|
| 1921 | $ 6.00 | 5% | 1932 | 90.64 | 4% |
| 1923 | 19.75 | 4¾% | | | |
| 1925 | 13.72 | 4¼% | Total | $230.52 | |
| 1927 | 41.31 | 4¼% | [4] Mason's | Minn.Stats.1927, | Sections |
| 1928 | 59.10 | 4¼% | 1581, 1582. | | |

annual installments of special assessments for local improvements on said premises, which shall, upon the customary installment plan or otherwise, become due and payable during said term on or after the first Monday of January, 1910; and will pay such taxes and assessments in every instance at least thirty (30) days before any fine, penalty, interest or cost might be added thereto for nonpayment thereof."

The only Minnesota decision called to our attention on the question presented is Craig v. Summers, 47 Minn. 189, 49 N.W. 742, 743, 15 L.R.A. 236. In that case the court considered a lease which provided that "the lessees were to pay all taxes, levies or assessments on the premises during the continuance of the lease", and the court said: "We think a fair interpretation of the language would make Summers [the lessee] liable for the taxes and assessments which were levied, and became a fixed liability against the land during the continuance of the original lease." The trustees concede that if the language of the McKnight lease were the same as that passed on in the Craig case they would be liable on the third cause of action of the complaint. But they point out that the covenant of the McKnight lease was not limited in language like the covenant in the Craig case, but goes on to specify that the promise of the lessee to pay all taxes and assessments beginning with those for the year 1909 includes, "all annual installments of special assessments for local improvements on said premises which shall, upon the customary installment plan or otherwise, become due and payable during said term on or after the 1st Monday of January, 1910." They argue:

"Were it not for this provision, the lessee would have been excused from the payment of such annual installments of special assessments levied prior to the commencement of the term as became payable during the term and would have been liable for the payment of an assessment levied shortly before the term ended although not payable until after the lease expired. It is quite obvious from reading the covenant as a whole that the parties to the lease decided that it would simplify the handling of taxes and assessments as between them if the lessee were to pay all annual installments of assessments falling due during the term of the lease, regardless of when the assessments were actually levied; that is to say, liability for payment of special assessments was to be determined not by the date of the assessment or levy, but by the due date of an annual installment of a special assessment. The lessee would take care of all such liabilities as accrued during the term of the lease and the lessor would become responsible for payments falling due after the lease ended.

"Had it been the intention of the parties that in the case of special assessments the obligation of the lessee to pay was to depend upon the date when an assessment was levied rather than upon the due date of any annual installment thereof, there would have been no occasion for incorporating in the lease the clause quoted above beginning 'including all annual installments.' Since this clause actually modifies the meaning of the broad covenant preceding it by including within the lessee's obligation to pay assessments levied during the term an obligation to pay parts of special assessments levied prior to the inception of the term, the clause must modify the general language preceding it by excluding from the lessee's liability to pay assessments such installments of special assessments as fall due after the lease terminates. The language of the quoted clause clearly does this, and if the clause modifies the preceding general language in one way, it certainly must in the other.

"That plaintiff itself construed the covenant in the same way as the defendants construe it, at least until this action was brought, is shown by the fact that there is no evidence whatsoever that at any time in all the seventeen years that the defendants occupied the premises as assignees of the lease did the plaintiff claim that payment of special assessments in annual installments was a breach of the covenants of the lease, nor that any demand was ever made by the plaintiff that special assessments be paid in a lump sum rather than on the installment plan. In fact, in plaintiff's letter of August 18, 1938, wherein plaintiff purported to set out the various breaches of the lease with which it charged the defendants, no charge is made that the nonpayment of such annual installments of special assessments as fell due after defendants' interest in the premises was terminated constituted a breach of the lease.

"A fair construction of the entire tax and assessment covenant, therefore, which is the construction placed on it by the parties themselves prior to the institution of this action, leads to the inevitable con-

clusion that the liability of the defendants under the covenant was to pay not all special assessments levied during the time that privity of estate existed between plaintiff and themselves, but only such annual installments of special assessments as fell due during this period."

We think that the trustees' contention is sound as to the true intent and meaning of the tax and assessment provision of the McKnight lease, and that it should be read in its entirety and in the light of the conduct of the parties in respect to it. We do not disregard the requirement that the lessee shall "pay such taxes and assessments in every instance at least 30 days before any fine, penalty, interest or cost might be added thereto for non-payment thereof", but the context in which the foregoing word "interest" appears, considered with the entire tax and assessment provision and the statutory practice of including special assessment installments "with and as a part of" the annual taxes each year compel the conclusion that the parties to the lease had in mind not that five per cent interest added as a matter of course to special assessment installments, but that interest which is exacted because of delinquency. There would be no "installments" if the total assessment were paid when levied and we think that as the requirements for the payment of installments favorable to the lessor in early periods of the lease were fully complied with the obligation of the lease was satisfied.

Judgment on the third cause of action should therefore be reversed.

## The Judgment Against the Trustees on the Fifth Cause of Action.

The plaintiff alleged in the complaint amended on the trial that it had no adequate remedy at law in respect to this cause of action. It alleged that the trustees during and after their occupancy had allowed the building on the premises to come into and remain in a dangerous and unsafe condition within the purview of certain laws and ordinances and contrary to paragraph 6 of Division II of the lease and had suffered waste to be committed contrary to paragraph 7 of Division II of the lease. The trial court found that the trustees had prior to April 10, 1938, and continuously ever since, allowed the building to come into and remain in an unsafe con-

dition; had not kept it in a safe condition as prescribed by the laws and ordinances, and had allowed the building to come into and remain in a condition violative of numerous specified laws and ordinances and had suffered waste to be committed in and to the building. That the cost of restoring the building to a safe condition and in all respects as is prescribed by the laws and ordinances, and of remedying the waste, was $806.56, and it was decreed in equity form: "That defendants forthwith restore the building on the premises hereinabove described to a safe condition and in all respects as is prescribed by the laws of the State of Minnesota and the ordinances of the City of Minneapolis, remedy the waste and injury committed in and to said building prior to April 11, 1938, and pay and expend in so doing at least the sum of $806.56."

It appears from the evidence that on April 10, 1938, when the lessees assigned the lease to George Dam, the lower floor of the building was occupied by a subtenant whom the trustees notified to pay the rent to the assignee, George Dam. It was a three-story building and the upper floors had been vacant a long time. The first floor tenant appears to have vacated some time in May, 1938. It does not appear that the plaintiff made any inspection of its property before June, 1938. That inspection revealed that the building had sustained some damage. There was some injury to the plumbing, fixtures, windows, walls, ceilings, stairways, flooring and doors, and there was some trash and rubbish scattered throughout, but all the damage consisted of relatively small items. The number of them ran the aggregate throughout the three-story building up to the amount which the court found would remedy the waste. The court's decree that the trustees restore the property and remedy the waste afforded complete remedy and relief to the owner as far as the waste or any unsafe or unlawful condition was concerned. The trustees do not dispute that waste occurred at some time and they have declared themselves ready and willing to comply fully with the court's order upon this cause of action. That part of the decree therefore based on the fifth cause of action of the complaint which orders them to restore the building and remedy the waste and to pay and expend in so doing at least the sum of $806.56, is affirmed.

The Judgment Against the Trustees on the Sixth Cause of Action.

It is alleged among other things in the sixth cause of action of the amended complaint that:

"On or about December 31, 1936, plaintiff and defendants made and executed a written agreement whereby the plaintiff agreed to accept cash rental under the lease for the period from May 1, 1936, to April 30, 1938, inclusive, in the amount of Two Thousand Dollars ($2,000) per annum instead of Three Thousand Seven Hundred Fifty Dollars ($3,750) per annum, as specified by the lease, all on condition that the rent at said reduced amount be promptly paid quarterly in advance and the lease performed in every other respect. Said agreement contained the following specific provision:

" 'If the payment of the rent and the performance of the lease on the part of the lessee is not performed within 10 days after any written demand made by the lessor by registered mail after any default on the basis of the reduced rents as above provided up to and including April 30th, 1938, all rentals under the original terms of the lease for said two-year period shall become due as rental under the lease.'

"On August 18, 1938, plaintiff by registered mail directed to defendants in care of defendant Central Hanover Bank and Trust Company, New York, New York, made a demand in writing of defendants that said rents due May 1, 1938, and August 1, 1938, upon said leased premises be paid and that said leased premises be rehabilitated and restored to a safe condition and in all respects as prescribed by the laws of the State of Minnesota and the ordinances of the City of Minneapolis, all within ten (10) days from said demand.

"Although more than ten (10) days have elapsed since the date of said written demand, the defendants have failed and neglected so to restore said leased premises and the buildings thereon, or to take any

action whatsoever to accomplish such restoration. Although demand has been made upon the defendants to pay to the plaintiff the additional rent due to it under the original terms of said lease and under the provisions of said agreement dated December 31, 1935, for the period from May 1, 1936, to April 30, 1938, inclusive, amounting to Three Thousand Five Hundred Dollars ($3,500), no part thereof has been paid."

Judgment was prayed on this cause of action for $3,500 and interest.

The trustees admitted:

"That on or about December 31, 1935, plaintiff and defendants entered into a written agreement for an abatement of the rental provided for by said lease, as alleged by plaintiff, and admit and allege that such abatement was conditioned upon the prompt payment of the rent at the reduced amount and the performance of the lease up to and including April 30, 1938. Defendants further admit that the said agreement contained the provision quoted by plaintiff in paragraph II of plaintiff's sixth cause of action and allege that said agreement also contained the following specific provisions:

" 'It is understood that the giving of this letter by the S. T. McKnight Company and the acceptance thereof by you shall not modify, increase or create any liabilities or prejudice such rights as either party has in respect to the lease above referred to except as herein provided for the concession in respect to rent.'

"Admit the allegations of paragraph V [5] thereof and allege in respect thereto that said demand made by plaintiff upon defendants was so general and wanting in detail in so far as it related to the alleged failure of defendants to rehabilitate and restore the improvements on the demised premises to a safe condition as to fail to give defendants adequate and proper notice of the default alleged by plaintiff to exist. Defendants further allege that plaintiff when requested by defendants to

[5] "Laws of the State of Minnesota, to-wit, Chapter 564 of the General Laws of 1913, as amended by Chapter 469 of Session Laws of 1917 (Mason's Minn.Stats. of 1927, Secs. 5960, 5961), provide that the State Fire Marshal and the Chief of the Fire Department of the City of Minneapolis may enter into all buildings and upon all premises within their jurisdiction for the purpose of examination, and the State Fire Marshal may condemn and by order direct the destruction, repair, or alteration of any building or structure which by reason of dilapidated condition, defective electric wiring, gas connections, heating apparatus, or other defect, is especially liable to fire and which building or structure, in his judgment, is so situated as to endanger life or limb or other buildings or property in the vicinity."

furnish them with the particulars of such alleged default, wholly failed and refused so to do.

"Admit and allege that defendants have made no repairs to said premises subsequent to April 10, 1938, and further admit that defendants have not paid the additional rent claimed by plaintiff to be due. Defendants allege, however, that all rent due the plaintiff from the defendants has been fully paid."

The court found that prior to and on or about the 11th day of April, 1938, the building "on the leased premises did not conform to the standard of safety prescribed by the ordinances of the City of Minneapolis and the laws of the State of Minnesota, and waste had been committed thereon, which condition was not remedied by defendants within ten days of August 18, 1938, when written demand therefor was made by plaintiff on defendants; and plaintiff is entitled to recover from the defendants the difference between the reduced rental for the period from May 1, 1936, to April 30, 1938, provided for in the agreement of December 31, 1935, between plaintiff and the defendants, and the rental provided for in the McKnight lease, aggregating the sum of Three Thousand Five Hundred Dollars ($3,500), together with interest thereon at 6% per annum from and after August 29, 1938," and rendered judgment against the trustees for the difference between the agreed rental for the two year period and the rental prescribed in the lease, to-wit $3,500.

There is no contention that the agreement fixing the reduced rental for the two year period from May 1, 1936, to April 30, 1938, was not in all respects valid and binding. The rent for that period therefor was $2,000 per annum and the additional amount of $3,500 which plaintiff has sued for in this sixth cause of action is in the nature of a penalty. The plaintiff was made whole against actual loss or damage to it on account of waste or unsafe condition of its property by the decree compelling the trustee to restore the property and remedy the waste.

In its opinion the court, after reciting the condition of the rent reduction agreement above quoted, stated: "The defendants by this agreement definitely bound themselves to make payment of rent on the basis of the original terms of the lease in the event of the defaults found herein to exist occurring. Having defaulted in the performance of covenants of the lease as to maintenance and upkeep and the avoidance of waste, the defendants were rendered liable for the additional sum of $3500."

We cannot agree that the liability of the trustees to forfeit their rent reduction and to pay the $3,500 additional rent was so absolute. Undoubtedly the notoriously depressed condition of property in 1935 was the mutually recognized reason for the temporary rent reduction [6] and the trustees should not be deprived of the reduction agreed upon without the clear and convincing showing that is always necessary to sustain a forfeiture.

The trustees had sublet the ground floor of the building and the upper floors were vacant a long time. It was fully understood that the trustees were not personally or through their agents in actual occupancy of the premises and they could not know the state and condition of the inside of the three story building at all times. The fundamental of the condition on which the McKnight company could compel the trustees to forfeit their rent reduction was that the McKnight company should give notice and make sufficient demand of what was due it and that the trustees should fail to comply with the demand before such forfeiture could be exacted. The letter which plaintiff wrote to the trustees on August 18, 1938, more than three months after the trustees had vacated the premises, was as follows:

"You are hereby informed that the premises at 23 South Sixth Street, Minneapolis, Minnesota, held by you under the lease dated May 1, 1909, by and between the undersigned, as lessor, and Charles D. Collins, named therein as lessee, are in a deplorable state of disrepair and neglect; that they are not in that safe condition prescribed and required by the laws of the State of Minnesota and the ordinances of the City of Minneapolis, and, particularly, by the Building and Safety Code of said city, being an Ordinance to Regulate all Matters concerning or pertaining to the Construction, Alteration, Repair, Addition to, Remodeling, Moving, Use, Maintenance, or Occupation of Buildings, or their Parts,

---

[6] See Wm. Lindeke Land Co. v. Kalman, 190 Minn. 601, 252 N.W. 650, 654, et seq., 93 A.L.R. 1393.

etc., in the City of Minneapolis, passed on March 29, 1934, and approved on April 3, 1934; that said state of disrepair and neglect, violative of said statutes and said ordinances, existed on and prior to April 15, 1938, and on said date and has existed continuously ever since.

"You are also hereby informed that no part of the rent due to the undersigned, as lessor under said lease, on May 1, 1938, for the quarter-year from May 1, 1938, to July 31, 1938, inclusive, and on August 1, 1938, for the quarter-year from August 1, 1938, to October 31, 1938, inclusive, has been paid.

"Because of said nonpayment of rent and because of your said failure so to maintain said premises, default exists under paragraphs 1 and 6 of division II of said lease.[7]

"Therefore, pursuant to the provisions of the proposal contained in our letter to you of December 31, 1935, which proposal was accepted by you, written demand is hereby made upon you by registered mail for the payment of said unpaid installments of rent and for the rehabilitation of said leased premises up to the standard required by said laws and said ordinances. If said payment and rehabilitation of said premises are not made and effected within ten (10) days of this demand, all rentals under the original terms of said lease for the two year period from May 1, 1936, to April 30, 1938, inclusive, aggregating $3,500.00 in addition to the rental payments heretofore made by you, shall become due as rental under said lease and said proposal of December 31, 1935."

The District Court found that no less than four of the laws and ordinances were violated by maintaining the building in the state to which it came during 1938, but there was no particular item of disrepair or waste found to have effected any one or all of the violations. It was apparently the aggregate of the very many small items. There was evidence that a back door was sprung so that it would not latch and no doubt much of the damage was the work of vandals. There was trash and rubbish which may have been left by the sub-tenants of the upper floors or the sub-tentant departing in May, 1938. Our search of the record fails to show when any particular item of injury occurred, but it is apparent that the condition of the property resulted directly from the physical abandonment of the building.

 Bearing in mind the wide scope of the lease provisions as to compliance with the building laws, ordinances and regulations respecting construction, maintenance, rubbish, combustible and inflammable material, keeping and storing boxes and barrels, fire hazard, use, repairs, occupancy and safety, etc., etc., we think the notice the McKnight company gave the trustees on August 18, 1938, to the effect that the premises were in a deplorable state of disrepair and neglect and not in the safe condition prescribed by the laws of Minnesota and the ordinances of the city and that said state of disrepair and neglect existed ever since, and the demand for rehabilitation up to the standard required by laws and ordinances, was not the kind of notice and demand upon which the right to forfeiture of the rent reduction was conditioned by the terms of the contract. The trustees having the right to assign their interest in the lease, as they did on April 11, 1938 (notice having been duly given to McKnight), they were not responsible

---

[7] "6. The Lessee will put and keep in safe condition and in all respects as is now or hereafter may be prescribed by the laws of this State, by ordinance of the City of Minneapolis, or by other lawful authority, said leased premises, including every building, structure or improvement, now or hereafter erected thereon, and the sidewalks, alleys, areas and passage-ways contiguous or adjacent thereto; will at its own expense defend any action or suit commenced against the Lessor, or against the Lessor and others, the ground of which is in whole or in part, the alleged failure of the Lessor, or the Lessor and others, to so put or keep said premises or said sidewalks, alleys, areas, or passage-ways; and will indemnify and save harmless the Lessor against each and every claim, demand, action and cause of action (including counsel and attorneys' fees) arising, in whole or in part, by reason of any defect or imperfection now or hereafter in said premises or said sidewalks, alleys, areas or passage-ways, or by reason of any failure to repair the same, or by reason of any liability or duty that is or may be imposed by the laws of this state, by ordinance of the City of Minneapolis, or by other lawful authority, upon the Lessor as owner, or by reason of any act or omission of the Lessee or others, as tenants or occupiers of said premises in or about the same."

for breaches of the lease after that time. They had paid their rent according to their contract up to April 30, 1938. In order to obtain the claimed forfeiture and $3,500.00 additional rent from the trustees it was incumbent on the lessor to specifically inform the trustees of some particular things that the trustees were required to perform and to give them ten full days to comply with some plain, clear and proper demand. But in contrast, when the trustees promptly responded to the letter of August 18, 1938, asking the McKnight company to be kind enough to advise of the specific instances of violations of the statutes and ordinances, the McKnight company refused and immediately brought this action demanding grossly exaggerated damages, more than six times greater than there was any proof of.

The testimony concerning the condition of the building in the months following the vacating by the trustees and removal by their sub-tenant is voluminous. We find no testimony to support the finding of the District Court that the building was in unsafe condition or in condition violative of the laws and ordinances prior to the assignment of the lease by the trustees. Nor is there any substantial evidence that it became so afterwards. It is shown that the numerous building regulations applicable to Minneapolis property were administered by certain city officials who were charged with making inspections and enforcement. The proper officers inspected the building and testified that they found no substantial violations. There was some trash and rubbish as stated, and it was removed. But there was no structural lapse or fault to render the building dangerous to any one outside or to any one going inside to make the needed repairs. A building contractor testified that in his opinion the building was unsafe but he did not specify for what it was unsafe. It was standing unused and vacant upon its site, but standing securely, and there was no lack of safety about it or any substantial violation of the laws or ordinances within the meaning of the lease to justify either a forfeiture of the lease under paragraph 6, supra, or a forfeiture of the rent reduction agreement. If there was waste at the time of the trustees' assignment (of which we find no evidence), such waste is not relevant to this sixth cause of action, because no demand was made upon the trustees in the letter of August 18th under the waste provisions of the lease. Those provisions were brought in upon the trial by amendment of the pleading in which the grossly exaggerated claims for recovery were made in the lawsuits.

Furthermore, it is evident from the wording of the letter of August 18th, pleaded and relied upon by plaintiff in its claim for forfeiture, that it asserted contractual obligation upon the lease on the part of the trustees not only to maintain the building after April 15, 1938, but to pay the subsequent rent. It was made impossible for the trustees to comply with the demand without re-entry upon the premises and assumption of obligation after they had, with notice to plaintiff, vacated them and assigned the lease as we hold they had the right to do. The damage that accrued from vandalism followed the physical abandonment of the property—a practically inevitable result in the large cities. The existence of the dispute between the parties as to the obligations of the trustees under the lease was the generating source. When it was recognized that the dispute had to be settled in litigation, a stipulation covering the disposition of the property in the interim was promptly made.

But the unjustified demands of the McKnight company and its conduct towards the trustees did not bring it within the conditions to entitle it to enforce forfeiture of the trustees' rent reduction right. "Forfeitures are not favored in law; indeed they are regarded with disfavor", 12 Am.Jur. 1016, Sec. 436; Mathews v. Mulvey, 38 Minn. 342, 37 N.W. 794; Rathborne, Hair & Ridgway Co. v. Coffron, 173 Minn. 452, 217 N.W. 501, 502; Warren v. Driscoll, 186 Minn. 1, 242 N.W. 346, 347, and where forfeiture is dependent upon the making of a demand and failure to comply with the demand, the failure to make a proper specific and reasonable demand is fatal to the enforcement of the forfeiture by a court of law or equity. Republic Inv. Co. v. Naches Hotel Co., 190 Wash. 176, 67 P.2d 858, 860; Tri-Bullion S. & D. Co. v. Ozark S. & M. Co., 24 N.M. 651, 176 P. 817; Byrkett v. Gardner, 35 Wash. 668, 77 P. 1048; 35 C.J. 1074, Sec. 246.

The judgment on the sixth cause of action is reversed.