Mary E. **MURPHY, individually, and as trustee for the heirs of Gary K. Murphy, decedent, Petitioner, Appellant (C1–85–88), Respondent (C7–85–158),**

v.

**MILBANK MUTUAL INSURANCE COMPANY, Petitioner, Respondent (C1–85–88), Appellant (C7–85–158),**

**Kemper Insurance Companies, Petitioner, Appellant, Respondent (C1–85–88, C7–85–158).**

Nos. C1–85–88, C7–85–158.

Supreme Court of Minnesota.

June 6, 1986.

David Sandberg, Forest Lake, for Murphy.

David Oskie, Golden Valley, for Milbank Mut.

Mark L. Pfister, Minneapolis, for Kemper Ins.

SIMONETT, Justice.

This case presents issues of whether uninsured motorist coverage should be implied for an insurer's failure to offer, whether uninsured and underinsured coverages are mutually exclusive, and whether stacking applies to a commercial fleet policy. We affirm in part and reverse in part.

On October 29, 1977, Gary Murphy, a Minnesota resident, while driving his employer's truck in Iowa, was fatally injured in a collision with a car. The car, owned and operated by an Iowa resident, carried the minimum bodily injury limits required by Iowa law of $10,000/20,000. Murphy's employer, U.S. Industries, kept Murphy's truck garaged and registered in Minnesota and insured with Kemper Insurance Company. Kemper's policy covered a commercial fleet of over 2,000 vehicles operated nationwide by U.S. Industries. The policy provided for uninsured motorist coverage conforming to the state where a particular vehicle was registered; consequently, Murphy's truck had $25,000/50,000 uninsured coverage as then required by Minnesota law. The policy had single limit liability coverage of $500,000. As written, the policy had no underinsured motorist coverage.

Decedent Murphy owned two family vehicles insured by Milbank Mutual Insurance Company. The Milbank policies contained uninsured motorist coverage of $50,000/100,000 on each vehicle. Milbank concedes this coverage may be stacked, thus affording $100,000 of uninsured motorist coverage for the Murphy death claim, subject to any Kemper coverage that might be primary. After collecting the $10,000 liability limits on the Iowa car, plus survivor's no-fault benefits and workers' compensation, the Murphy heirs considered establishing additional coverage under the employer's policy with Kemper.

Consequently, plaintiff Mary E. Murphy, trustee for the heirs of her deceased husband, brought this suit against defendants Kemper and Milbank. The original complaint alleged that the Murphy heirs were entitled to uninsured motorist coverage under both policies. On plaintiff's motion for summary judgment, the trial court held that the Iowa car, even though carrying $10,000/20,000 liability coverage, was an "uninsured motor vehicle" under Minnesota's No-Fault Act. On appeal, we affirmed. *Murphy v. Milbank Mutual Insurance Co.*, 320 N.W.2d 423 (Minn.1982). On return of the case to the trial court, plaintiff expanded her theory of recovery. First, she claimed that Kemper having failed to offer optional additional uninsured motorist coverage, $500,000 of uninsured coverage should be read into the policy by operation of law, and she moved for partial summary judgment on this claim. Second, she claimed that underinsured coverage should also be read into Kemper's policy, and she moved to amend her complaint to claim underinsured as well as uninsured coverage. The trial court rejected both claims, ruling that there was no additional uninsured coverage because, at the times involved, Kemper was not required to offer it, and, further, that underinsured and uninsured coverages were mutually exclusive.

The case then went to arbitration, with the trial court's rulings on the legal issues reserved for later judicial review. The arbitrators assessed the trustee's damages at $800,000, and put 70% fault on the Iowa driver and 30% on decedent Murphy. Plaintiff was thus awarded $560,000, reduced by $10,000 no-fault survivor's benefits already paid. The district court confirmed the award of $550,000 but ruled

Kemper need pay only $15,000 of the award with Milbank paying $100,000, plus prejudgment interest on each award.

Both trustee Murphy and defendant Milbank appealed to the court of appeals. The court of appeals held: (1) reversing the trial court, that $500,000 of uninsured motorist coverage would be implied by law; (2) affirming the trial court, that underinsured coverage was not available to plaintiff; and (3) affirming the trial court, that any uninsured coverages in the Kemper policy could not be stacked. (On two other issues not appealed to this court, the court of appeals held that Kemper could not set off either the $10,000 paid by the tortfeasor's insurer or the workers' compensation benefits received by Mary Murphy.) *Murphy v. Milbank Mutual Insurance Co.*, 368 N.W.2d 753 (Minn.Ct.App.1985). We granted the petitions of all three parties for further review.

I.

We first consider whether additional uninsured coverage must be read into Kemper's policy. The policy covered the period April 1, 1977, to April 1, 1978, and contained the mandatory $25,000/50,000 uninsured motorist coverage. Almost two months after the policy was issued, on May 27, 1977, a Minnesota law went into effect requiring insurers to offer optional additional uninsured motorist coverage in an amount equal to the residual bodily injury limits of the policy. Minn.Stat. § 65B.49, subd. 6(f) (Supp.1977).[1] Thus our first issue is: Since Kemper did not make an offer of optional coverage under subdivision 6(f), which went into effect during the policy period, should this coverage be add-

---

1. 1977 Minn. Laws ch. 276, § 3, effective May 27, 1977, amended Minn.Stat. § 65B.49 (1976) by providing as follows:

    Subd. 6. **Mandatory offer; added coverage.** Reparation obligors shall offer the following optional coverages in addition to compulsory coverages:

        \*     \*     \*     \*     \*     \*

    (f) Uninsured motorist coverage in addition to the minimum limits specified in subdivi-

sion 4, so as to provide total limits of uninsured motorist coverage equal to the residual bodily injury liability limits of the policy, or smaller limits as the insured may select. This coverage may be offered in combination with the coverage under clause (e).

We should add that subd. 6(f) was repealed in 1980. 1980 Minn. Laws ch. 539, § 7.

ed to the policy by operation of law? We say no.

Minn.Stat. § 65B.49, subd. 4 (1976) (repealed 1985), provided that no insurance policy may be "renewed, delivered or issued for delivery, or executed" without the statutory minimum uninsured coverage. Subdivision 6(f) of the same section then required the insurer to offer additional uninsured coverage. We believe the section must be "construed as a whole to harmonize all its parts," *Owens v. Federated Mutual Implement & Hardware Insurance Co.*, 328 N.W.2d 162, 164 (Minn.1983); and we hold, therefore, that subdivision 6(f) is to be read as requiring offers of optional coverage to be made when a policy is issued or renewed after the effective date of the subdivision.[2]

In this case, Kemper's policy was not renewed after the effective date of the subdivision (May 27) and before the date of Murphy's accident (October 29). The court of appeals, however, felt that several endorsements added to the policy after its issuance so "amended" the policy as to activate the mandatory offer statute. We disagree. The case closest on point is *Folstad v. Farmers Insurance Exchange*, 297 Minn. 496, 210 N.W.2d 238 (1973).[3] There we held that adding an additional driver to the named insured's auto policy, with the insurer issuing a new declarations sheet containing a rate class change and a premium increase, was a "significant transaction" involving more than a policy renewal, thus activating a statute mandating that a rejection of uninsured coverage must be in writing unless the transaction involved was only a policy renewal.

■ Here four endorsements were added to Kemper's policy, mostly deleting some subsidiaries from coverage, although one endorsement may have added a few subsidiaries or clarified the identity of some subsidiaries already covered. Two of these endorsements were declared to have effective dates *prior* to May 27. The fact these two were not countersigned by the insurer until after May 27 is not particularly significant. The other two endorsements, Nos. 36 and 38, had effective dates after May 27 but each merely deleted a subsidiary. Here we have a commercial fleet policy covering over 2,000 vehicles operating nationwide, negotiated in New York, and involving a premium of almost $200,000. In this context, considering the nature and effective dates of the endorsements, we conclude the endorsements made during the policy period do not constitute a renewal or the kind of "significant transaction" contemplated by *Folstad* that triggers Kemper's duty under subdivision 6(f) to offer the optional uninsured coverage for the vehicles garaged and registered in Minnesota.

We reverse the court of appeals on this issue and hold, as a matter of law, that optional additional uninsured motorist coverage is not to be read into the Kemper policy.

## II.

Assuming Kemper's policy has underinsured coverage,[4] the next issue is whether

---

2. Plaintiff Murphy argues that when the legislature made May 27, 1977, the effective date of subdivision 6(f) it intended insurers to make their offer immediately and not wait for a policy's renewal or amendment. Since the Murphy accident did not happen until October 29, 1977, plaintiff says there was ample time after the effective date of subdivision 6(f) for Kemper to have made its offer. Plaintiff does not suggest how Kemper could have had time to make its offer if the accident had instead occurred, say, on May 27, except to say the statute permits no waiting period. This argument is inconsistent with our holding in *Owens v. Federated Mutual, supra,* and without merit.

3. The court of appeals did not cite *Folstad* but instead relied on *Ritchie v. United Services Automobile Ass'n,* 363 N.W.2d 851 (Minn.Ct.App. 1985), *pet. for review denied* (May 24, 1985). *Ritchie* does not, however, deal with the issue we have here. *Ritchie* only held that offers of underinsured coverage which were adequate when made in September 1976 were inadequate, due to a statutory amendment, in July 1977 when the accident occurred.

4. Kemper did not include underinsured motorist coverage in its policy. Unlike the situation with uninsured motorist coverage, at the time the Kemper policy was negotiated Minnesota

plaintiff is entitled to recover underinsured motorist benefits as well as the $25,000 of uninsured benefits admittedly provided by the policy. The court of appeals held that underinsured and uninsured benefits are "mutually exclusive" and that, because there was uninsured coverage, there could not be underinsured coverage. We do not agree.

We need to look at Minn.Stat. § 65B.49 (1976). Subdivision 4(3) defines an uninsured motor vehicle as "any motor vehicle for which a plan of reparation security meeting the requirements of [sections 65B.41 to 65B.71] is not in effect." Subdivision 6(e) describes underinsured motorist coverage as first-party coverage that pays insureds benefits to the extent that "the total damages they are legally entitled to recover exceed the residual liability limit of the owner of the other vehicle." Kemper argues that the Iowa tortfeasor's car cannot be deemed "underinsured" because it was held in the earlier appeal to be "uninsured." Murphy points out, however, that the statutory description of underinsured coverage nevertheless fits the Iowa tortfeasor's car because, even though the car did not have legally sufficient residual liability limits under Minnesota law, it did have residual liability coverage, and that is all underinsured coverage requires. Kemper counters by arguing that the legislature must have intended the phrase "residual liability limit" to mean legally sufficient Minnesota liability limits.

■ The issue is one of legislative intent. Only when an insured has an accident in a foreign state with a foreign vehicle having lower liability limits than Minnesota does it appear that the question of duplicative coverage arises.[5] The fact is that the Iowa tortfeasor's vehicle fits the legislature's de-

scriptions of both uninsured and underinsured coverage. The statutory language describing each coverage is complete and unambiguous. It is idle for us to speculate if the legislature intended or even thought about duplicative coverage in a case such as we have here. We must take the legislature at its word. If it seems odd for a vehicle to be both uninsured and underinsured, nothing in the No-Fault Act suggests that oddity cannot be.[6] But if the No-Fault Act allows duplicative *coverages*, it is clear that the Act does not intend duplicate *recoveries*. Minn.Stat. § 65B.42(5) (1984); *Bartel v. New Haven Township*, 323 N.W.2d 806, 808 (Minn.1982) (primary purpose of the Act is to avoid duplicative recoveries). We hold, therefore, that both uninsured and underinsured coverage may be applicable to decedent's Iowa auto accident, and, if so found, plaintiff can recover under either, but not both, coverages.

In view of this ruling, the case must be remanded to the district court to determine whether underinsured coverage should be implied by operation of law. There are issues of fact whether, in the course of negotiations between U.S. Industries and Kemper for the commercial fleet policy, which apparently involved bid specifications submitted by a broker on behalf of U.S. Industries, an offer of underinsured coverage was made, or if not, if it was waived by U.S. Industries.

### III.

The last issue, raised by Murphy, is whether she may stack the $25,000 uninsured motorist coverage that does exist in Kemper's commercial fleet policy. The court of appeals said no, stating that the

law required Kemper to offer U.S. Industries $500,000 of underinsured coverage. Minn.Stat. § 65B.49, subd. 6(e) (1976) (repealed 1980). We assume for the purposes of this discussion that Kemper failed to make the mandatory offer for underinsured coverage.

**5.** All vehicles garaged or registered in Minnesota must have the minimum residual liability limits of $25,000/50,000. Minn.Stat.

§ 65B.48, subd. 1 (1976). Further, the residual liability limits of an out-of-state vehicle are deemed to be at least the Minnesota statutory minimum while the vehicle is in Minnesota. Minn.Stat. § 65B.50, subd. 2 (1976).

**6.** Under the 1985 amendments to the No-Fault Act, uninsured and underinsured coverages are combined into one mandatory coverage. Minn. Stat. § 65B.49, subd. 3a (Supp.1985).

record failed to show that premiums were calculated on a per vehicle basis. We agree stacking is not allowed but for a different reason.

For there to be stacking, the claimant must be an "insured" under all the coverages to be stacked. *See Doerner v. State Farm Mutual Automobile Insurance Co.,* 337 N.W.2d 394 (Minn.1983). Gary Murphy was an insured under Kemper's uninsured motorist coverage solely because he was an occupant of the truck involved in the accident.[7] In other words, Murphy was an "insured" under the coverage for the truck he was driving. He was not, however, an insured for any of the other 2,000 or so vehicles owned by U.S. Industries. Therefore, Murphy has no coverages to stack.

We hold that the occupants of an insured motor vehicle involved in an accident, who have uninsured motorist coverage solely because of their status as passengers, may not stack the uninsured motorist coverage under a separate policy of insurance purchased by the owner of the involved vehicle for a noninvolved vehicle unless they qualify as insureds under that policy.

*Doerner,* 337 N.W.2d at 398.

Latching onto the phrase "may not stack the uninsured motorist coverage *under a separate policy*" (emphasis added) in the foregoing quotation, Murphy contends *Doerner* does not apply here because U.S. Industries has a single policy for all its vehicles. Murphy relies on *Boroos v. Roseau Agency, Inc.,* 345 N.W.2d 788 (Minn.

Ct.App.1984), *pet. for review denied* (December 24, 1984), wherein the court of appeals previously so interpreted the *Doerner* quotation. A distinction between single and separate policies for stacking is irrelevant to the *Doerner* rationale. The court in *Doerner* discussed *Integrity Mutual Insurance Co. v. State Automobile & Casualty Underwriters Insurance Co.,* 307 Minn. 173, 239 N.W.2d 445 (1976), where the injured claimant was driving his father's No. 1 vehicle and his father also had a second vehicle insured under the same policy. Quoting from *Integrity Mutual,* we emphasized that "[t]he parties appear to agree that [the injured son] enjoyed the [uninsured] coverage provided with respect to automobile No. 2. We assume they so agree because [the son] was a relative and *not simply because [the son] was an occupant of automobile No. 1.*" *Doerner,* 337 N.W.2d at 396, *quoting Integrity Mutual,* 307 Minn. at 178 n. 3, 239 N.W.2d at 448 n. 3. In other words, *Doerner* did not limit itself to multiple policies; an insured who seeks to stack coverages on other vehicles under the same policy must also be an insured as to those other vehicles. Because Murphy was an insured solely as an occupant, Murphy is barred from stacking the uninsured motorist coverage in the other U.S. Industries vehicles.[8]

## IV.

In the preceding section of this opinion, we decide the stacking issue contrary to the court of appeals' *Boroos* decision, even

---

7. "Persons insured" under Kemper's policy are defined as follows:

   Each of the following is an insured under this insurance to the extent set forth below:
   (a) the named insured and any designated insured and, while residents of the household, the spouse and relatives of either;
   (b) any other person while occupying an insured highway vehicle; and
   (c) any person, with respect to damages he is entitled to recover because of bodily injury to which this insurance applies sustained by an insured under (a) or (b) above.
   The insurance applies separately with respect to each insured, except with respect to the limits of the company's liability.

8. Nor do endorsements 16 and 26 expand, in any relevant manner, the policy definition of an insured. Endorsement 16 merely allows U.S. Industries to agree to add additional insureds to the policy. Endorsement 26 says, "[S]uch insurance as afforded by the policy for bodily injury and property damage applies to any person with respect to the use of motor vehicle owned or hired by the named insured together with any trailer owned or hired by such person * * *." This endorsement only extends liability coverage to any person *with respect to the use of* a vehicle owned or hired by U.S. Industries.

though we had denied a petition for further review in *Boroos* over a year ago. This prompts us to comment on the effect of a denial of a petition for further review.

 "Review of any decision of the Court of Appeals is discretionary with the Supreme Court." Minn.R.Civ.App.P. 117, subd. 2; *see* Minn.Stat. § 480A.10, subd. 1 (1984). Consequently, denial of a petition for further review means no more than that the supreme court has declined, at that time and for whatever undisclosed reasons, to consider the matter. Our discretionary review is not unlike the certiorari jurisdiction of the United States Supreme Court, where that court has often said that a denial of certiorari cannot be interpreted as an adjudication or expression of opinion on the merits of the case. *Brown v. Allen,* 344 U.S. 443, 497, 73 S.Ct. 397, 441, 97 L.Ed. 469 (1953); *State of Maryland v. Baltimore Radio Show,* 338 U.S. 912, 917–19, 70 S.Ct. 252, 254–55, 94 L.Ed. 562 (1950) (Frankfurter, J.).

This court may agree with the result below but not its reasoning, or vice versa, or neither, or may agree with both the result and the reasoning. Whatever the situation, this court applies the criteria of Rule 117, such as the statewide importance of the issue involved, and either grants or denies the petition for further review.[9] It takes three votes for a grant. (Infrequently, after accepting a petition for what at the time seemed sufficient reasons, we may dismiss an appeal as improvidently granted for not meeting our review criteria.)

The temptation to read significance into a denial of a petition for further review is best resisted. The denial does not give the court of appeals decision any more or less precedential weight than a court of appeals decision from which no review was sought. The denial "means only that, for one reason or another which is seldom disclosed, and not infrequently for conflicting reasons which may have nothing to do with the merits and certainly may have nothing to do with any view of the merits taken by a majority of the Court, there were not [three] members of the Court who thought the case should be heard." *Brown,* 344 U.S. at 492, 73 S.Ct. at 439.

Affirmed in part, reversed in part, and remanded.

---

**9.** Currently there are petitions for further review in about 20% of the court of appeals decisions, and the supreme court receives, on an average, 50–55 petitions each month. Approximately 25% of the petitions filed are granted. Thus about 5% of court of appeals decisions receive further review. On an average, this court acts on petitions for review within 38 days from the filing of the petition in this court and within 60 days from the court of appeals decision.