**AMCO INSURANCE COMPANY, Plaintiff,**

**v.**

**Mary O. LANG, as Trustee of the Heirs and Next of Kin of Maxine C. O'Loughlin, Deceased, and Thomas J. O'Loughlin, Defendants.**

**No. C4–87–1790.**

Supreme Court of Minnesota.

March 25, 1988.

Kay Nord Hunt, Thomas E. Peterson, Kathryn H. Davis, Minneapolis, for plaintiff.

Michael Fargione, Minneapolis, for defendants.

COYNE, Justice.

The question presented by this action for a judgment declaratory of rights and liabilities with respect to the underinsured motorist coverage afforded by a plan of reparation security is before this court upon certification by the United States District Court, District of Minnesota, pursuant to Minn.Stat. § 480.061 (1986):

> May an insurer enforce the language of its insurance policy, which precludes the stacking of underinsured motorist coverages and requires the reduction from underinsured motorist limits of amount paid by a negligent tortfeasor, when the insurance policy was issued for a one year term on November 5, 1984, and the insured's accident occurred on October 24, 1985, during the policy term but after the October 1, 1985, effective date of certain Minnesota legislation?

We answer the question in the negative.

The parties have stipulated to these facts:

Thomas and Maxine O'Loughlin are the named insureds under an AMCO personal automobile insurance policy providing underinsured motorist coverage with a single limit of $300,000 per accident with respect to each of two described automobiles for the policy period November 5, 1984 to November 5, 1985. The total policy premium included two separate premiums for the underinsured motorist coverage, one for each covered vehicle.

During the policy period, while occupying one of the described vehicles, the O'Loughlins were involved in a two-car collision. Maxine was killed and Thomas was seriously injured. After the other driver's insurer had paid its liability policy limits of $100,000, Thomas O'Loughlin and the trustee for Maxine's heirs and next of kin asserted

claims for benefits under the underinsured motorist coverage. They contend that stacked underinsured motorist coverage limits of $600,000 are available to satisfy their claims.

The accident giving rise to the O'Loughlin claims occurred on October 24, 1985. Relying on the anti-stacking and reduction of benefits language of its policy and on amendments to the Minnesota No–Fault Automobile Insurance Act which became effective October 1, 1985, AMCO contends that its $200,000 payment to Thomas O'Loughlin and the trustee exhausted the limits of the underinsured motorist coverage.

It must be conceded, we believe, that if the language of the AMCO policy were accorded full force and effect, $300,000 would indeed be the maximum limit of AMCO's liability under its underinsured motorist coverage for all damages resulting from the accident of October 24, 1985, regardless of the number of vehicles described or premiums shown on the policy declaration sheet, and that the $300,000 should be reduced to $200,000 by the $100,-000 paid AMCO's insureds by the tortfeasor's insurer. Since 1973, however, when this court permitted the stacking of the uninsured motorist coverage of four separate policies issued to an insured, *Van Tassel v. Horace Mann Insurance Company*, 296 Minn. 181, 207 N.W.2d 348 (1973), it has been the rule in Minnesota that first party coverages follow the person, not the vehicle, and that policy provisions designed to preclude recovery of first party benefits for which the insurer has collected a separate premium are contrary to public policy and are, therefore, void. *E.g., Wasche v. Milbank Mut. Ins. Co.*, 268 N.W.2d 913 (Minn.1978) (basic economic loss benefits stacked); *Holman v. All Nation Ins. Co.*, 288 N.W.2d 244, 251 (Minn.1980) (underinsured motorist coverage stacked); *Sobania v. Integrity Mut. Ins. Co.*, 371 N.W.2d 197, 201 (Minn.1985) (underinsured motorist coverage stacked).

In *Wasche*, the first stacking case arising under the Minnesota No–Fault Automobile Insurance Act, the court noted that the No–Fault Act made no reference to stacking and invited clarification of legislative intent. *Wasche*, 268 N.W.2d at 919–20. After thrice rejecting anti-stacking proposals,[1] in 1985 the legislature adopted the following pertinent amendments to the No–Fault Act:

> Subd. 3a. **Uninsured and Underinsured Motorist Coverages.**
>
> \* \* \* \* \* \*
>
> (5) If at the time of the accident the injured person is occupying a motor vehicle, the limit of liability for uninsured and underinsured motorist coverage available to the injured person is the limit specified for that motor vehicle.
>
> \* \* \* \* \* \*
>
> (6) Regardless of the number of policies involved, vehicles involved, persons covered, claims made, vehicles or premiums shown on the policy, or premiums paid, in no event shall the limit of liability for uninsured and underinsured motorist coverages for two or more motor vehicles be added together to determine the limit of insurance coverage available to an injured person for any one accident.

Act of June 27, 1985, ch. 10, § 68, 1985 Minn.Laws 1st Sp.Sess. 1781, 1840–41, codified at Minn.Stat. § 65B.49, subd. 3a(6) (1986).

> With respect to underinsured motor vehicles, the maximum liability of an insurer is the lesser of the difference between the limit of underinsured motorist coverage and the amount paid to the insured by or for any person or organization who may be held legally liable for the bodily injury; or the amount of damages sustained but not recovered.

Act of June 7, 1985, ch. 309, § 6, 1985 Minn.Laws 1537, 1539, codified at Minn. Stat. § 65B.49, subd. 4a (1986). Whatever

---

1. H.F. No. 1707, Sec. 2, 70th Minn.Leg., 1978 Sess.; S.F. No. 64, 72nd Minn.Leg., 1981 Sess.; S.F. No. 622, H.F. No. 810, 73rd Minn.Leg., 1983 Sess.

may have been the legislature's intent when it enacted the No–Fault Act in 1974 and during the intervening years, these 1985 amendments declare a public policy plainly at variance with that articulated in the case law. Does this new statement of public policy affect the enforceability of anti-stacking and reduction of benefits clauses in policies issued prior to the effective date of these amendments? We think not.

The provision in the session laws addressing the effective date of these amendments states that they "are effective October 1, 1985, and apply to all insurance policies providing benefits for injuries arising out of the maintenance or use of a motor vehicle or motorcycle that are executed, issued, issued for delivery, delivered, continued, or renewed in this state after September 30, 1985." Act of June 27, 1985, ch. 10, §§ 121, 125, 1985 Minn.Laws 1st Sp.Sess. 1781, 1870–72. AMCO contends that the presence of the term "continued" makes the amendments applicable on October 1, 1985 to all previously issued policies which remained in force after September 30, 1985, as well as to policies "that are executed, issued, issued for delivery, delivered, * * * or renewed" after September 30, 1985. We are of the opinion this interpretation comports neither with general principles governing the construction and application of statutes nor with basic contract law.

■ An insurance policy, like any other contract, is customarily governed by the law in effect at the time the policy is issued or the contract is made. *Despatch Oven Co. v. Rauenhorst*, 229 Minn. 436, 443, 40 N.W.2d 73, 78 (1949); *Hoff v. First State Bank of Watson*, 174 Minn. 36, 39, 218 N.W. 238, 239 (1928). 13 Appelman, *Insurance Law and Practice* § 7382 (1976). Since a statute operates prospectively unless the legislative language clearly indicates that it should apply retrospectively, Minn.Stat. § 645.21 (1986), a statute enacted during the term of an insurance policy does not usually apply to that policy until the policy is renewed. 1 Couch, *Cyclopedia of Insurance Law* § 13:15 (rev. 2d ed. 1984). *Cf. Hauer v. Integrity Mut. Ins. Co.*, 352 N.W.2d 406, 408 (Minn.1984) (underinsured motorist coverage will not be read into policies renewed after date of repeal of mandatory offer). As a practical matter, it is not uncommon for statutes regulating insurance to provide expressly for application to policies issued or renewed after a specified date. *E.g.*, Minn.Stat. § 65B.49, subd. 4 (1976) (repealed 1985). Here, the legislature has directed that the amended statute is to apply to all policies "that are executed, issued, issued for delivery, delivered, continued, or renewed" after September 30, 1985. That a policy existing on September 30, 1985, thereafter "continues" or remains in force for the balance of its prescribed term does not invoke the application of the amended statute. Act of June 27, 1985, ch. 10, § 125, 1985 Minn. Laws 1st Sp.Sess. 1781, 1872, is cast in the passive voice—thus denoting a subject acted upon by external force and limiting application of the amendment to policies "that are executed, issued, issued for delivery, delivered, continued, or renewed" after September 30, 1985. Description of the action depends on whether the policy acted upon is a new policy or an existing policy. New policies "are executed, issued, issued for delivery, [or] delivered"; existing policies "are * * * continued, or renewed" at the end of the policy period. Whether the payment of a renewal premium results in the extension or continuation of the original policy or the formation of a new and independent contract depends primarily on the intention of the parties as ascertained from the policy itself. *Hudson v. Reserve Life Ins. Co.*, 245 S.C. 615, 141 S.E.2d 926, 927 (1965). *Cf., St. Paul Fire & Marine Ins. Co. v. Bierwerth*, 285 Minn. 310, 318, 175 N.W.2d 136, 141 (1969). 43 Am.Jur.2d, *Insurance*, § 443 (1982).

■ The AMCO policy issued to the O'Loughlins expressly provided a policy period of one year, from November 5, 1984 to November 5, 1985. The policy had been

issued and the premium paid long before September 30, 1985, and nothing more was required of either party in order to keep the policy in force for the remainder of the policy period. According to its own terms the policy remained in force without external intervention; no one had to perform any kind of action to maintain the policy in uninterrupted operation to its expiration date on November 5, 1985.

The AMCO policy, too, treats "renewal" and "continuation" as alternative methods of maintaining uninterrupted insurance coverage at the end of a policy period. The policy contains this automatic termination provision:

> If we offer to *renew or continue* and you or your representative do not accept, this policy will terminate at the end of the current policy period. Failure to pay the required *renewal or continuation* premium when due shall mean you have not accepted our offer. (Emphasis supplied).

In November 1985 AMCO sent its policyholders a letter in which "renewal or continuation" again appear:

> ON YOUR AUTO *RENEWAL OR CONTINUATION*, WE WILL ADD AT LEAST THE MINIMUM AMOUNTS OF UNDERINSURED MOTORISTS COVERAGE IF YOUR POLICY DOES NOT ALREADY PROVIDE THE COVERAGE. (Emphasis supplied).

And with respect to the stacking of first party coverages, the following:

> ON YOUR AUTO *RENEWAL OR CONTINUATION*, WE WILL PROVIDE ENDORSEMENTS WHICH WILL ELIMINATE THE "STACKING" FEATURE OF YOUR CURRENT COVERAGE. HOWEVER, WE WILL ALSO PROVIDE YOU WITH AN OPPORTUNITY, IN ACCORDANCE WITH LEGISLATIVE REQUIREMENTS, TO AGAIN PURCHASE THE "STACKING" ARRANGEMENT. (Emphasis supplied).

AMCO's repeated reference to "renewal or continuation" as interchangeable actions to be performed at the end of the current policy period confirms our conclusion that the 1985 amendments to the No–Fault Act do not apply to existing policies until they are renewed or continued at the expiration of the policy period ending after September 30, 1985.

Moreover, the advice contained in AMCO's November letter points up the inconsistencies in AMCO's position. The advice that AMCO will include at least minimum amounts of underinsured motorist coverage when the policy is renewed or continued conforms with the time frame set out at Minn.Stat. § 65B.40, subd. 3a(1) (1986).[2] Clause 2 of subdivision 3a,[3] which requires owners to maintain underinsured motorist coverage, does not set out any time requirements. If, as AMCO contends, the 1985 amendments apply to all policies remaining in force after September 30 (except for provisions expressly applicable to renewed or newly issued policies), owners would be required to maintain underinsured motorist coverage before insurers would be required to include it. It seems to us highly unlikely that the legislature

2. Minn.Stat. § 65B.49, subd. 3a(1) (1986) provides as follows:

> (1) No plan of reparation security may be renewed, delivered or issued for delivery, or executed in this state with respect to any motor vehicle registered or principally garaged in this state unless uninsured and underinsured motorist coverages are provided therein. The coverages combined, at a minimum, must provide limits of $25,000 because of injury to or the death of one person in any accident and $50,000 because of injury to or the death of two or more persons in any accident. In the case of injury to, or the death of, two or more persons in any accident, the amount available to any one person must not exceed the coverage limit provided for injury to, or the death of, one person in any accident. For purposes of this subdivision, uninsured motorist coverage and underinsured motorist coverage shall be a single coverage.

3. Minn.Stat. § 65B.49, subd. 3a(2) (1986) provides as follows:

> (2) Every owner of a motor vehicle registered or principally garaged in this state shall maintain uninsured and underinsured motorist coverages as provided in this subdivision.

intended the various clauses of a unitary plan for a single coverage comprising uninsured and underinsured motorist coverage and contained in a single subdivision of a single section of the No–Fault Act to apply to one policy of insurance at various times.

AMCO contends, however, that even if the statutory provisions did not apply to the O'Loughlin policy on the date of the accident, once the legislature's expression of public policy went into effect AMCO was no longer precluded from enforcing the anti-stacking and reduction-of-benefits provisions of its policy. While underinsured motorist coverage was, until October 1, 1985, an optional coverage, the terms of which were not statutorily mandated, this court had declared that anti-stacking provisions and reduction-of-benefits provisions were void as against public policy when the insured had paid separate premiums for first party coverages with respect to more than one vehicle. *Sobania v. Integrity Mut. Ins. Co.*, 371 N.W.2d 197, 199–201 (Minn.1985); *American Motorist Ins. Co. v. Sarvela*, 327 N.W.2d 77, 78–79 (Minn. 1982). It is well established that contract provisions which conflict with statutory law "or the well clarified and clearly expounded rules set forth by judicial decision" will not be enforced. *Wm. Lindeke Land Co. v. Kalman*, 190 Minn. 601, 606, 252 N.W. 650, 652 (1934). And a subsequent change in public policy does not validate insurance contract provisions which violated public policy and were, therefore, invalid when the insurance policy was issued. *See Interinsurance Exch. of Auto. Club of Southern Cal. v. Ohio Casualty Ins. Co.*, 58 Cal.2d 142, 23 Cal.Rptr. 592, 594, 373 P.2d 640, 642 (1962). *See also Handy v. St. Paul Globe Publishing Co.*, 41 Minn. 188, 42 N.W. 872 (1889).

Certified question answered in the negative.