Jose CANTU, Appellant,

v.

The **ATLANTA CASUALTY COMPANIES, an Illinois corporation, Respondent.**

No. C8–94–2296.

Court of Appeals of Minnesota.

June 6, 1995.

Review Granted July 27, 1995.

Mark G. Wermerskirchen, Neeser, Darval & Nelson, P.A., Joe E. Thompson, Kathryn N. Smith, Schmidt, Thompson, Johnson & Moody, Willmar, for appellant.

Roger H. Gross, Elliot L. Olsen, Gislason, Dosland, Hunter & Malecki, Minnetonka, for respondent.

Considered and decided by SHORT, P.J., and DAVIES and FOLEY *, JJ.

## OPINION

DAVIES, Judge.

Appellant Jose Cantu challenges a district court's grant of summary judgment in favor of his insurer, respondent Atlanta Casualty Companies (Atlanta). The district court interpreted the Minnesota No–Fault Act as providing that the addition of mandatory uninsured motorist (UM) coverage to a policy issued out-of-state occurs only when the policy is subsequently renewed, delivered, or executed in Minnesota, not contemporaneous with the insured's move to Minnesota. We reverse and remand.

## FACTS

The material facts are undisputed. Jose Cantu, while a resident of Florida, purchased motor vehicle insurance from Atlanta. Cantu rejected UM coverage (optional in Florida). In May of 1991, Cantu and his family moved to Minnesota. Atlanta did not become aware that Cantu had become a Minnesota resident, however, until after Cantu's wife was killed in a Minnesota automobile accident in September 1991. She was a passenger in an uninsured motor vehicle when the accident occurred. Atlanta, not having issued a Minnesota policy to Cantu, denied

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const.

UM coverage and was granted summary judgment.

In a supplemental affidavit submitted to the district court, Cantu explained that Atlanta was unaware of his move because, although he and his agent had discussed Cantu's move a number of times, Atlanta or the agent had erroneously confused Cantu's file with that of a Jose *T.* Cantu, who lived in Texas.

## ISSUE

Does an automobile insurance policy issued to a resident of another state provide uninsured motor vehicle coverage immediately upon the insured becoming a Minnesota resident?

## ANALYSIS

On appeal from summary judgment, this court reviews

(1) whether there are any genuine issues of material fact and (2) whether the lower courts erred in their application of the law.

*State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). Where, as here, the material facts are not disputed, we need not defer to the trial court's application of the law. *Hubred v. Control Data Corp.,* 442 N.W.2d 308, 310 (Minn.1989).

This case turns on the interpretation of Minn.Stat. § 65B.50, subd. 1 (1992), and the meaning of its cross-reference to section 65B.49. Section 65B.50, subdivision 1, provides:

> Every insurer licensed to write motor vehicle accident reparation and liability insurance in this state *shall * * * afford* at least the *minimum security provided by section 65B.49* to all policyholders, except that in the case of nonresident policyholders it need only certify that security is provided with respect to accidents occurring in this state.

(Emphasis added.) Minn.Stat. § 65B.49, subd. 3a (1992), provides:

*art. VI, § 10.*

No plan of reparation security may be renewed, delivered or issued for delivery, or executed in this state with respect to any motor vehicle registered or principally garaged in this state unless separate uninsured and underinsured motorist coverages are provided therein.

Atlanta argues that this section did not require it to provide UM coverage because Cantu's policy was not "renewed, delivered, issued for delivery, or executed" while Cantu resided in Minnesota. Atlanta points to a distinction between subdivision 3a of Minn. Stat. § 65B.49, quoted above, and the earlier enacted subdivision 1, which requires insurers to provide liability and basic no-fault coverages when a policy is "issued, renewed, *continued*, delivered, issued for delivery, or executed in this state." Minn.Stat. § 65B.49, subd. 1 (emphasis added). Atlanta concedes that it has an obligation to provide the subdivision 1 coverage (liability and basic no-fault). But Atlanta argues that, by omitting the word "continued" in subdivision 3a, the legislature deliberately sought to postpone the provision of UM coverage until a policy is renewed.

We disagree. We find it significant (though not critical) that section 65B.50's only reference to section 65B.49 requires coverage in conformance with the "*minimum security* provided by section 65B.49" (emphasis added). This means the types and minimum amounts of coverages required by section 65B.49. Notably, the reference does *not* say "pursuant to section 65B.49," which might put into play other aspects of that section, such as the date on which the coverages are first required. Thus, we believe that a literal reading of Minn.Stat. § 65B.50, subd. 1, supports the conclusion that the cross-reference does not implicate the effective date of the various types of coverages included in the "minimum security provided by section 65B.49." In other words, the date of UM coverage is established by section 65B.50 itself, not by the cross-reference.

Even more significantly, the different terminology of subdivisions 1 and 3a simply accomplishes the different schedule the legislature desired for instituting quite different mandated coverages. In passing the no-fault act in 1974, the legislature intended for all automobile insurance policies then in existence to be converted to no-fault policies on January 1, 1975. Because the no-fault system established tort exemptions, the legislature realized that no-fault coverage had to be initiated for all Minnesotans contemporaneously. In order to convert all existing policies to no-fault policies on the first day of tort exemptions, the legislature included the word "continued" in subdivision 1.

In contrast, when the mandate of UM coverage was adopted in 1985, blanket conversion was not vital. (Some Minnesotans had had UM coverage for a decade, while others had not.) Further, a blanket conversion would have forced repricing all policies on the effective date of the new compulsory coverage. Therefore, the legislature allowed UM coverage to be rolled into replacement policies as old policy periods came to an end during the 12 months following the effective date of the UM mandate.

But the accident in this case occurred in 1991, more than five years after the transition year in which UM coverage was first mandated. By then, 100 percent of Minnesota auto insurance policies included UM coverage. The issue here, then, is whether motorists moving into this state in 1991 are to be thrown back to the status of Minnesotans in 1985–86 (with only some having UM coverage) or if they are to be treated like all other *Minnesota residents* of 1991 (when everyone had UM coverage). We believe that it is more appropriate to treat new residents the same as all other Minnesotans and that the legislature so intended.

Atlanta argues that case law holds that revisions of the no-fault act only apply to a policy when it is renewed or delivered, citing *AMCO Ins. v. Lang*, 420 N.W.2d 895, 898 (Minn.1988), *Murphy v. Milbank Mut. Ins.*, 388 N.W.2d 732, 736 (Minn.1986), and *Hauer v. Integrity Mut. Ins.*, 352 N.W.2d 406, 409 n. 4 (Minn.1984).

But the three cited cases all concern whether mandatory language in a new statute should be read into an existing policy *during a year of transition.* Implicit in the supreme court's holdings in *Lang, Murphy,*

and *Hauer* is an understanding that reformation of all existing policies on the effective date of the legislation mandating new coverage would prove to be an administrative nightmare. *See Lang,* 420 N.W.2d at 899–900 (noting that it would be inequitable to require insureds to maintain coverage before insurers were required to provide the same coverage); *Murphy,* 388 N.W.2d at 736 n. 2 (dismissing plaintiff's argument that insurer had ample time to offer coverage where accident occurred more than six months after statute's amendment because "[p]laintiff does not suggest *how* [the insurer] could have had time to make its offer if the accident had instead occurred, say, on [the effective date of the statute]") (emphasis added); *Hauer,* 352 N.W.2d at 408 ("To hold otherwise would subject an insurer to potential liability some 5 or 10 years after the legislature expressly repealed the mandatory offer provision.").

Unlike the plaintiffs in *Lang, Murphy,* and *Hauer,* Cantu is only asking this court to require his insurer to conform his policy in all respects to *existing* Minnesota mandates contemporaneously with his becoming a Minnesota resident. The administrative nightmare associated with giving all policyholders simultaneous notice of newly mandated coverage—and billing for it—is simply not present in cases of nonresidents moving into Minnesota one-by-one.

We hold, therefore, that the no-fault act requires that an automobile insurance policy issued out-of-state automatically and immediately provide uninsured motor vehicle coverage (not just liability and basic no-fault, the other mandated coverages) when the policyholder becomes a Minnesota resident.

Given the facts before us, our decision in this case is not an easy one. Cantu specifically declined UM coverage while a Florida resident. Moreover, because of a confusion of identities, Atlanta was not able to promptly adjust its premiums when Cantu first moved to Minnesota. Therefore, Atlanta did not have the immediate opportunity to bill for any increased premiums associated with the mandated UM coverage. Nonetheless, fault for the confusion of identities lies with Atlanta.

## DECISION

Under the terms of the no-fault act, Cantu's automobile insurance policy provided uninsured motorist coverage. The district court's grant of summary judgment in favor of Atlanta Casualty is reversed and the case is remanded for trial.

**Reversed and remanded.**

SHORT, Judge, dissenting.

I respectfully dissent. While Minn.Stat. § 65B.49, subd. 1 (1992) mandates that insurers provide no-fault coverage to any insured if the policy was "issued, renewed, *continued,* delivered, issued for delivery, or executed in this state," Minn.Stat. § 65B.49, subd. 3a(1) (1992) only requires insurers to provide uninsured motorist coverage to state residents if the resident's policy is "renewed, delivered or issued for delivery, or executed in the state." (Emphasis added.) We must presume the legislature intentionally resisted inclusion of "continued" in subdivision 3a. Minn.Stat. § 645.19 (1992); *Transport Leasing Corp. v. State,* 294 Minn. 134, 137, 199 N.W.2d 817, 819 (1972); *see Meister v. Western Nat'l Mut. Ins. Co.,* 479 N.W.2d 372, 378 (Minn.1992) (reviewing courts must presume "the legislature acted with full knowledge of prior legislation on the same subject"); *see also AMCO Ins. Co. v. Lang,* 420 N.W.2d 895, 898 (Minn.1988) (noting the word "continued" in Minn.Stat. § 65B.49, subd. 1 is akin to "renewed," and does not refer to a situation where a policy remains in force for the balance of its prescribed term).

Minn.Stat. § 65B.49, subd. 3a(1) does not apply to nonresidents or individuals like Cantu who move to Minnesota but have not yet renewed their existing policies or purchased new policies. *See Lang,* 420 N.W.2d at 898 ("[A] statute enacted during the term of an insurance policy does not apply to that policy until the policy is renewed."); *Murphy v. Milbank Mut. Ins. Co.,* 388 N.W.2d 732, 736 (Minn.1986) (a change in an insurance statute requires the insurer to offer optional coverage only when a policy is issued or renewed after the effective date of the statute); *Hauer v. Integrity Mut. Ins. Co.,* 352 N.W.2d 406, 409 (Minn.1984) (where legislature elimi-

nates insurer's obligation to offer underinsured motorist coverage, the coverage will not be read into existing policies renewed after the date of repeal). Cantu declined Atlanta Casualty's offer of uninsured coverage while a Florida resident. In addition, he did not renew, receive or execute a new automobile insurance policy with Atlanta Casualty after moving to Minnesota. Given these facts, the clear language of the statute, and relevant case law, reformation of Cantu's policy is inappropriate. I would affirm the trial court's grant of summary judgment.